**WEST CHESTER AREA SCHOOL DISTRICT, Petitioner,**

v.

**COLLEGIUM CHARTER SCHOOL, Respondent.**

**Bernard R. Miller and Harry I. Shreiner, Petitioners,**

v.

**Collegium Charter School, Respondent.**

**West Chester Area School District, Petitioner,**

v.

**State Charter School Appeal Board, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 8, 2000.

Decided Aug. 25, 2000.

Reargument Denied Nov. 1, 2000.

Ross A. Unruh and John L. Hall, West Chester, for petitioner, West Chester Area School District.

William R. Lloyd, Jr., Harrisburg, for petitioners, Bernard Miller and Harry Shreiner.

R. David Walk, Jr., Philadelphia, for respondent.

Before FRIEDMAN, J., KELLEY, J. and McCLOSKEY, Senior Judge.

FRIEDMAN, Judge.

We are presented here with consolidated appeals that require this court to consider and apply the Charter School Law[1] (CSL).[2] Petitioners Bernard R. Miller and Harry I. Shreiner (together, Taxpayers) and Petitioner West Chester Area School District (School District) appeal from the September 7, 1999 order of the State Charter School Appeal Board (CAB) which: (1) reversed the decision of the School District's Board of School Directors (District Board) to deny Collegium Charter School's (Collegium) charter school application; (2) directed the District Board to grant Collegium's charter school application and sign Collegium's charter;[3] (3)

---

**1.** Act of March 10, 1949, P.L. 30, added by the Act of June 19, 1997, P.L. 225, 24 P.S. §§ 17–1701–A to 17–1732–A.

**2.** The General Assembly enacted the CSL in June of 1997 in an effort to improve the quality of education throughout the Commonwealth. The legislature sought to provide parents and students with an alternative to traditional public schools through the operation of charter schools that, while funded with public money, would operate independently of the existing school district structure.

**3.** Section 1717–A(i)(9) of the CSL, 24 P.S. § 17–1717–A(i)(9), provides that a decision of the CAB to reverse the decision of the local board of directors shall serve as a requirement for the local board of directors to grant

denied Taxpayers' petition to intervene; and (4) denied the School District's petition for stay/supersedeas. In addition, the School District appeals from the CAB's September 29, 1999 determination to deem Collegium's charter approved and from the CAB's subsequent execution of that charter.

I.

September 7, 1999 Order [4]

On November 13, 1998, Collegium, a Pennsylvania non-profit corporation, submitted a charter school application (Application) to the District Board requesting a five-year charter pursuant to the CSL. (S.R. at 26b–96b.) Collegium intends to enter into a management agreement with Mosaica Education, Inc. (Mosaica), a for-profit corporation, under which Mosaica will provide the school with educational and administrative services. (S.R. at 52b.) Under Collegium's proposed educational program, students would receive morning instruction in core subjects and afternoon instruction in the Paragon Curriculum developed by Mosaica.

The District Board held public hearings on the Application on December 14, 1998, January 5, 1999 and February 1, 1999,[5] receiving testimony from Collegium in support of the Application, as well as testimony from the School District administration and members of the public. In addition, various exhibits were entered into the record. At its February 16, 1999 meeting, the District Board voted six to one to deny Collegium's Application, and, on February 22, 1999, the District Board issued its written decision setting forth its findings of fact, its conclusions of law and its reasons for the denial. Summarizing these conclusions and reasons, the District Board stated that "[b]ecause the Collegium proposal will not improve pupil learning, increase learning opportunities for all pupils and encourage the use of different innovative teaching methods which will be an improvement over that which already exists in the School District, the legislative intent of the [CSL] has not been fulfilled." [6] (District Board op. at 15, R.R. at 249a.)

the application and sign the written charter of the charter school.

4. References to the reproduced record in this portion of the opinion are to the record created for the cases docketed at 2403 C.D.1999 and 2406 C.D.1999.

5. Under section 1717–A(d) of the CSL, 24 P.S. 17–1717–A(d), the local board of school directors in which the proposed charter school will be located must hold at least one public hearing on the provisions of the charter application within 45 days of the application's receipt.

6. The legislative intent was to: (1) improve pupil learning; (2) increase pupils' learning opportunities; (3) encourage the use of different and innovative teaching methods; (4) create new professional opportunities for teachers; (5) provide parents and pupils with expanded choices in the educational opportunities available within the public school system; and (6) hold the schools accountable for meeting measurable academic standards. Section 1702–A of the CSL, 24 P.S. § 17–1702–A. The legislative concept was to retain the charter schools' accountability to state and local authority but afford charter schools the flexibility to provide an innovative and unique curriculum and to develop educational techniques that might serve as models for all public schools. To this end, the legislature relieved charter schools from having to follow many of the laws and regulations governing other public schools, in the hope that freeing charter schools to function without being hindered by these mandates would encourage innovation. *See* section 1715–A of the CSL, 24 P.S. § 17–1715–A. The legislature set forth guidelines for the evaluation of charter school applications by local school boards in section 1717–A(e)(2) of the CSL. This section provides:

A charter school application submitted under this article shall be evaluated by the local board of school directors based on criteria including, but not limited to, the following:
 (i) The demonstrated, sustainable support for the charter school plan by teachers, parents, other community members and students, including comments received at the public hearing held under subsection (d).
 (ii) The capability of the charter school applicant, in terms of support and plan-

In order to be eligible to appeal the District Board's denial, Collegium, acting pursuant to sections 1717–A(i)(2) to 1717–A(i)(4) of the CSL, 24 P.S. § 17–1717–A(i)(2) to 17–1717–A(i)(4), obtained the requisite number of signatures of School District residents on petitions.[7] In a filing entitled "Petition to Appeal," Collegium then presented the signatures to the Chester County Court of Common Pleas (trial court) for a determination of their sufficiency.[8] (R.R. at 260a–61a.) Prior to the trial court's hearing on the Petition to Appeal, Taxpayers filed, and the trial court granted, a petition to intervene in the proceedings as taxpaying residents of adjacent school districts likely to be affected by Collegium's student recruitment.[9] (R.R. at 262a–67a, 270a.) On June 4, 1999, following the hearing, the trial court deemed Collegium's Petition to Appeal sufficient, thereby certifying that Collegium's appeal conformed to the CSL requirements. (R.R. at 312a.)

By letter dated June 15, 1999, counsel for the CAB acknowledged receipt of the trial court's June 4, 1999 decree initiating Collegium's appeal with the CAB. The letter informed counsel for Collegium and counsel for the School District that Collegium's appeal to the CAB had been filed and assigned a docket number but that it would be held in abeyance until all members of the CAB were appointed and the CAB commenced functioning under the CSL.[10] (R.R. at 358a–59a.)

On July 1, 1999, Collegium filed a separate appeal document with the CAB, in which Collegium addressed the merits of its appeal. (R.R. at 315–25a, 361a.) On that same date, the CAB held its first public meeting, during which the CAB acknowledged receipt of Collegium's July 1, 1999 appeal and appointed a hearing offi-

---

ning, to provide comprehensive learning experiences to students pursuant to the adopted charter.

(iii) The extent to which the application considers the information requested in section 1719–A and conforms to the legislative intent outlined in section 1702–A.

(iv) The extent to which the charter school may serve as a model for other public schools.

24 P.S. § 17–1717–A(e)(2). In addition to these specifically enumerated criteria, the District Board evaluated Collegium's charter application based on the fiscal impact of the charter school on the School District, performing a cost/benefit analysis. After evaluating these criteria, the District Board made 53 separate findings of fact, (R.R. at 238a–49a), and, based on those findings, concluded that the legislative intent of the CSL had not been fulfilled by Collegium's application.

7. Subsection 1717–A(i)(2) provides in pertinent part:

In order for a charter school applicant *to be eligible to appeal* the denial of a charter by the local board of directors, the applicant must obtain the signatures of at least two per centum of the residents of the school district or of one thousand (1,000) residents, whichever is less, who are over eighteen (18) years of age.... The signatures shall be obtained within sixty (60) days of the denial of the application by the local board of directors in accordance with clause (3).

24 P.S. § 17–1717–A(i)(2) (emphasis added). Subsections 1717–A(i)(3) and 1717–A(i)(4) provide further petition requirements.

8. This was done pursuant to subsection 1717–A(i)(5) of the CSL, which provides:

If the required number of signatures are [sic] obtained within sixty (60) days of the denial of the application, the applicant may present the petition to the court of common pleas of the county in which the charter school would be situated. The court shall hold a hearing only on the sufficiency of the petition.... The court shall issue a decree establishing the sufficiency or insufficiency of the petition. If the petition is sufficient, the decree shall be transmitted to the State Charter School Appeal Board for review in accordance with this section. Notification of the decree shall be given to the applicant and the local board of directors.

24 P.S. § 17–1717–A(i)(5).

9. In addition, the School District filed a separate motion to quash Collegium's appeal as premature. (R.R. at 286a–88a.) However, the trial court did not rule on this motion.

10. Pursuant to the CAB's request, (R.R. at 358a–59a), Collegium forwarded a copy of the Petition to Appeal, which the CAB filed on June 25, 1999. On that same date, the

cer to assist the CAB in the matter. (R.R. at 362a.) Shortly thereafter, Taxpayers filed a petition to intervene before the CAB, (R.R. at 326a–33a), which the hearing officer denied in a prehearing order dated July 14, 1999. Following the parties' submission of briefs in support of their respective positions, the CAB heard oral argument.

■ On August 27, 1999, the CAB voted (1) to reverse the District Board's February 22, 1999 decision denying Collegium's charter school Application; (2) to deny Taxpayers' petition to intervene; and (3) to deny the School District's request for stay. The CAB articulated the reasons for its determination in a written decision and order issued on September 7, 1999, basing that decision on its own findings of fact and conclusions of law made after an independent review of the District Board's findings and conclusions. The School District and Taxpayers filed separate appeals from that September 7, 1999 order. This court *sua sponte* ordered the consolidation of these appeals, and we now consider the various issues raised therein.[11]

### A. Premature Appeal

Petitioners first argue that the CAB erred by failing to quash or dismiss Collegium's appeal as premature. Petitioners base this argument on subsection 1717–A(f) of the CSL, which provides in relevant part:

> At the option of the charter school applicant, a denied application may be revised and resubmitted to the local board of school directors. **Following the appointment and confirmation of the Charter School Appeal Board** under section 1721–A, **the decision of the local board of school directors may be appealed** to the appeal board. *(3)27* **No appeal from a decision of a local school board may be taken until July 1, 1999.**

24 P.S. § 17–1717–A(f) (emphasis added). Petitioners assert that Collegium filed its appeal before July 1, 1999 and prior to the appointment and confirmation of the CAB, thereby violating the clear terms of the CSL and acting contrary to the General Assembly's intent to prohibit appeals during the two-year period following enactment of the CSL. Although recognizing that Collegium filed a separate "appeal" on July 1, 1999, Petitioners challenge the CAB's determination that this subsequent filing started the appeal process.[12] (*See*

School District filed the return of the record with the CAB.

11. Because the CAB is the administrative agency charged with exclusive review of an appeal of a local school board decision not to grant a charter application, section 1717–A(h), (i)(1) of the CSL, 24 P.S. § 17–1717–A(h), (i)(1), this court's scope of review is appellate. Section 1717–A(i)(10) of the CSL, 24 P.S. § 17–1717–A(i)(10). Therefore, we shall affirm the CAB's determination unless this court determines that the adjudication is in violation of constitutional rights, or is not in accordance with the law, or is not supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Shenango Valley Regional Charter School v. Hermitage School District and Sharon City School District*, 756 A.2d 1191 (Pa. Cmwlth.2000.)

12. The CAB determined that Collegium's appeal did not begin, as urged by Petitioners, when Collegium filed its Petition to Appeal with the trial court on April 19, 1999. To the contrary, the CAB concluded that Collegium's Petition to Appeal, despite its misleading name, could not be construed as an appeal from the Application denial. The CAB reasoned that this filing was not the type that would be used for such an appeal and that the trial court is not the entity empowered to hear the actual appeal or decide its outcome based on the merits. According to the CAB, in filing the Petition to Appeal with the trial court, Collegium only did what the CSL requires in sections 1717–A(i)(2) to 1717–A(i)(5), 24 P.S. §§ 17–1717–A(i)(2) to 17–1717–A(i)(5), to be "*eligible*" to take an appeal to the CAB for a review on the merits; however, because the CAB has exclusive review of an appeal by a charter school applicant, 24 P.S. § 17–1717–A(i)(1), the appeal cannot be said to begin until the applicant files with that body. Furthermore, the CAB pointed out that section 1717–A(i)(7) of the CSL, 24 P.S. § 17–1717–A(i)(7), provides that the CAB meet and review an appeal within 30 days of the "notice

CAB op. at 20.) In fact, Petitioners maintain that, because the CSL does not contemplate any filing other than the Petition to Appeal,[13] the inevitable conclusion is that Collegium began the appeal process when it filed the Petition to Appeal with the trial court on April 19, 1999. We disagree that the CAB erred in allowing Collegium to pursue its appeal.

Initially, we acknowledge that Collegium began the appeal *process* prior to July 1, 1999. In fact, the CAB concedes as much in its June 15, 1999 letter informing the parties that receipt of the trial court decree initiates the filing of Collegium's appeal with the CAB. However, we also

recognize that the CAB did not formally accept Collegium's appeal or review the denial of Collegium's Application until July 1, 1999.[14] We believe that, by taking this course of action, the CAB adopted a suitable means of allowing applicants affected by the CSL's two-year moratorium on appeals (Affected Applicants)[15] to take a timely appeal that offended neither the letter nor the spirit of the statutory restriction.[16]

The CSL provides a right of appeal to a charter school applicant denied a charter by the local school board, 24 P.S. § 17–1717–A(i)(2) to 17–1717–A(i)(5), and, al-

---

of acceptance of the appeal." Because the CAB issues its "notice of acceptance of the appeal" only after the trial court determines the sufficiency of the petition, the CAB concluded that Collegium could not have begun the appeal process prior to that June 4, 1999 determination. (CAB op. at 19–20.)

Petitioners counter that the CSL uses the term "eligible" to describe the need for applicants to obtain signatures prior to starting the appeal process by filing the Petition to Appeal with the trial court. Further, Petitioners maintain that, even if the CSL required an appeal to be filed with, and accepted by, the CAB after the determination of sufficiency, this occurred either on June 15, 1999, when the CAB received and acknowledged the trial court's decree initiating the filing of Collegium's appeal, or on June 25, 1999, when the Petition to Appeal and certified record were filed with the CAB. Therefore, Petitioners argue, Collegium's appeal still was premature.

**13.** Petitioners point out that issuance of the trial court's decree of sufficiency triggers notice, review and decision requirements for the CAB without ever requiring, or even suggesting, the need for further action or filing by a charter school applicant. *See* sections 1717–A(i)(5) to 1717–A(i)(8), 24 P.S. § 17–1717–A(i)(5) to 17–1717–A(i)(8).

**14.** In accepting Collegium's appeal, it appears that the CAB accepted Collegium's July 1, 1999 "appeal," rather than the trial court's decree establishing the sufficiency of Collegium's Petition to Appeal. We are aware that the CSL does not require an applicant to file a separate appeal with the CAB, and we do not insert such a requirement into the CSL's appeal process. However, because we see no harm in Collegium's submission of this "ap-

peal" document, we will ignore this procedural irregularity.

**15.** Pursuant to section 1717–A(i)(2) of the CSL, "signatures shall be obtained within sixty (60) days of the denial of the application by the local board of directors" and, only *if* the required signatures are obtained within this time period may the applicant present the petition to the court of common pleas for a determination of sufficiency. 24 P.S. § 17–1717–A(i)(5). However, the CSL never explicitly limits the time for presenting such petitions. Although we note that, in its explanation of the appeal process, the Department of Education (DOE) states that there is no *time requirement for this step*, (R.R. at 310a), Petitioners assert that it is absurd to construe the CSL as imposing a time limit on the collection of signatures while allowing an applicant to wait indefinitely before presenting those signatures to the court of common pleas. However, in our resolution of the issue raised here, we need not address Petitioners' assertion.

**16.** Collegium points out that the DOE's Office of Educational Initiatives has published an explanation of the charter school appeal process that is consistent with the CAB's approach to appeals by Affected Applicants. In that explanation, the DOE states that appeals received before July 1, 1999 are to be acknowledged and docketed, but held in abeyance and not formally accepted until July 1, 1999. (R.R. at 310a.) According to Collegium, these interpretations are entitled to great deference because these are the agencies charged with administering and applying the CSL. *See Henkels & McCoy, Inc. v. Department of Labor and Industry, Prevailing Wage Appeals Board*, 143 Pa.Cmwlth. 264, 598 A.2d 1065 (1991), *appeal denied*, 530 Pa. 667, 610 A.2d 46 (1992). Although noting the DOE's

though no appeal may be taken *until* July 1, 1999, 24 P.S. § 17–1717–A(f), nothing in the CSL eliminates the statutorily-granted appeal right for Affected Applicants. Therefore, consistent with the CSL's statutory language and with the policy that statutory ambiguities and construction principles require a right of appeal, *see Department of Transportation v. Quinlan,* 47 Pa.Cmwlth. 214, 408 A.2d 173 (1979), we must conclude that the legislature did not intend to preclude an Affected Applicant's right to appeal altogether, but merely intended to delay legal disposition of the matter.[17]

The problem that confronted Collegium was that, in drafting the CSL, the legislature failed to clarify how Affected Applicants could make themselves *eligible to appeal* charter application denials and, at the same time, exercise their *right to appeal* those denials.[18] Petitioners suggest that Collegium's only remedy was to resubmit its Application to the District Board pursuant to section 1717–A(f) of the CSL, 24 P.S. § 17–1717–A(f);[19] however, we cannot agree that this is what the legislature intended. The CSL clearly provides revision and resubmission of a charter school application as an *option* for the rejected charter applicant. 24 P.S. § 17–1717–A(f). To hold as Petitioners urge would nullify this choice[20] for an Affected Applicant because, in choosing not to resubmit its application, the applicant would involuntarily forfeit its right to appeal.

■ Moreover, the CSL obviously envisions that a charter school applicant will revise the denied application before resubmitting it to the local school board for reconsideration. Because Collegium had no plans to revise its Application, resubmission to the District Board would be a pointless duplication of effort. Undoubtedly, Collegium would resubmit the same Application; the District Board would be

explanation of its appeal procedure, we do not resolve this issue on that basis.

**17.** The object of all interpretation and construction of statutes is to ascertain and effectuate the intent of the General Assembly. Here, nothing in the legislative history of the CSL can be construed as extinguishing the right of appeal for Affected Applicants. To the contrary, legislative discussions support the determination that such appeals merely were to be delayed. The following passages illustrate this point. Senator Mowrey indicated that, to overcome objections and obstacles to the implementation of charter schools, the legislature agreed to modify the CSL, including *"delaying* the start-up of an appeals mechanism." (Legislative Journal–Senate, June 11, 1997 at 754, R.R. at 368a.) Senator Bodack noted that, to temporarily placate those concerned about Harrisburg's meddling in local decisions, the sponsors of the CSL agreed to *"delay* the effective date of the [CAB] until July 1, 1999." (Pa. Legislative Journal–Senate, June 11, 1997 at 761, R.R. at 372a.) Senator Schwartz voiced her approval of the "2–year waiting period for an appeals process." (Pa. Legislative Journal–Senate, Dec. 9, 1997 at 1299, R.R. at 366a.) Similarly, Representative Cowell expressed agreement with the compromise legislation that "strikes a middle ground in that there is no appeal available for 2 years *and then there is an*

*appeal . . .* to [the CAB]." (Pa. Legislative Journal–House, June 11, 1997 at 1457, R.R. at 375a.)

**18.** Under the interpretation urged by Petitioners, a rejected charter school applicant is eligible to appeal only if it collects the requisite signatures and presents them to the court of common pleas within 60 days of the local board's decision. Thus, once the local board denies a charter school application, the timing of the appeal process is removed from the applicant's control. Obviously then, under Petitioners' interpretation, a local board decision issued more than 60 days prior to July 1, 1999 would completely extinguish an Affected Applicant's right to appeal the denial of its charter to the CAB.

**19.** According to Petitioners, unaffected applicants had two options following the denial of a charter application; they could avail themselves of the resubmittal option in section 1717–A(f) of the CSL, or they could take an appeal pursuant to CSL sections 1717–A(i)(2) to 17–1717–A(i)(5). However, Petitioners contend that, because the CSL prohibits appeals prior to July 1, 1999, Affected Applicants were left with the first option only.

**20.** Every statute should be construed, if possible, to give effect to all its provisions. Sec-

required to hold additional hearings, only to deny the Application a second time; Collegium would have to obtain signatures again; and the trial court, once more, would have to determine the sufficiency of Collegium's Petition to Appeal. Under the principles of statutory construction, we must presume that the General Assembly did not intend such an absurd and unreasonable result. *See* section 1922(1) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1922(1). Thus, we interpret the statutory language as allowing a charter school applicant to take preliminary steps in the appeal process prior to July 1, 1999, but delaying the CAB's acceptance of appeals and consideration of their merits until after that date.

Uncertain what was intended in the statute, Collegium took the precaution of collecting the requisite signatures for appeal and presenting them to the trial court within sixty days; in addition, Collegium filed a precautionary "appeal" with the CAB on July 1, 1999. Despite Collegium's best efforts to conform to the appeal procedure prescribed in the CSL, Petitioners argue that we should quash Collegium's appeal as violative of the legislature's intent to preclude appeals taken before July 1, 1999. However, where the CAB took no action until the prescribed statutory period had elapsed, the purpose behind the statutorily imposed delay of appeals was accomplished, and the harm to be prevented by allowing immediate appeals from charter application denials was prevented.[21] Ac-

cordingly, for all the reasons stated, we conclude that the CAB acted properly in refusing to dismiss Collegium's appeal.

### B. The CAB's Standard of Review

■ Petitioners argue that the CAB erred by substituting its own independent judgment instead of deferring to the judgment of the District Board and limiting review of the District Board decision to a determination of whether the District Board committed an error of law or abused its discretion. (School District's brief at 26.) Petitioners contend that, in reviewing the District Board's decision, the CAB should have applied the standard of review set out in the Local Agency Law, 2 Pa.C.S. § 754, which requires affirmance of a local agency decision unless the agency's decision is "in violation of the constitutional rights of the appellant, or is not in accordance with law ... or [if] any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence." (School District's brief at 28.) We disagree.

Subsection 1717–A(i)(6) of the CSL specifically provides:

In any appeal, the decision made by the local board of directors shall be reviewed by the appeal board on the record as certified by the local board of directors. **The appeal board shall give due consideration to the findings of the local board of directors and specifically articulate its reasons for agreeing or disagreeing with those findings**

tion 1921 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921.

**21.** The CSL represents compromise legislation. The legislature rejected a version of the CSL that allowed for immediate appeal from a rejection of a charter school application to the Secretary of Education. Instead, appeal was made available after two years, not to a single person but to the CAB, a state board appointed by the Governor and subject to confirmation by the Senate. The two-year moratorium on appeals was inserted as a compromise to address the concerns of the local school boards. The time was intended to give all those concerned an opportunity to

work out flaws in the legislation, to learn from the experiences of the implementation of the legislation and to deal with the school finance issue more knowledgeably. The General Assembly understood that the CAB can override locally elected boards and impose state dictates on the backs of local taxpayers, (Pa. Legislative Journal–Senate, June 11, 1997 at 761, R.R. at 372a); thus, it was intended that for two years no charter school would be imposed on a school district over the wishes or despite the wishes of a locally elected school board. (Pa. Legislative Journal–House, June 11, 1997 at 1457; R.R. at 375a.) Even then, the appeal could be forwarded only if a petition process demonstrat-

in its **written decision.** The appeal board shall have the discretion to allow the local board of directors and the charter school applicant to supplement the record if the supplemental information was previously unavailable.

24 P.S. § 17–1717A(i)(6) (emphasis added.) This section explicitly directs that the CAB **"specifically articulate its reasons for agreeing or disagreeing"** with the findings of the local board of directors. By giving the CAB the right to disagree with the local school board and requiring it to specifically articulate its reasons for doing so, the General Assembly has unquestionably granted the CAB the authority to substitute its own findings and independent judgment for that of the local school board. Moreover, it is significant that the statute requires the CAB to also "specifically articulate its reasons for **agreeing**" with the **findings**, as opposed to the decision, of the of the local school board. In doing so, the General Assembly clearly intended that the CAB should not limit its review simply to a determination of whether the local school board abused its discretion, i.e., whether its findings were based on substantial evidence.[22]

This procedure is in accord with the "[m]inimum requirements of due process" which "demand that a litigant have, at some stage of a proceeding, a neutral fact-finder." *Belasco v. Board of Public Education,* 510 Pa. 504, 515, 510 A.2d 337, 343 (1986). In *Belasco,* our supreme court noted that the local school board is not "an independent and impartial adjudicator."[23] *Id.* at 514, 510 A.2d at 342. Similarly, here, we cannot ignore the fact that local school boards have a significant interest in whether charters are granted; indeed the legislative history contains frequent references to the bias of local school boards against charter schools. (*See, e.g.,* R.R. at 364a–66a, 368a.) Thus, here, as in *Belasco,* there is a need for a neutral fact finder at **some stage** of the proceedings – one which will consider the findings made by the local school board but which will remain free to **"disagree[ ] with those findings"** and draw its own conclusions after "due consideration"[24] of those findings. 24 P.S. § 17–1717–A(i)(6).

Here, also, the importance of the CAB having *de novo* review is underscored by the fact that the Commonwealth Court is limited to appellate review of the CAB's decision and may not make findings of fact. *See* 24 P.S. § 17–1717–A(i)(10). Thus, unless the CAB is empowered to be the ultimate fact finder, there would be no

---

ed substantial support for the charter school in the local community.

**22.** This statutory scheme is not dissimilar to that provided in section 504 of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 824, which provides that the UCBR "may affirm, modify, or reverse" the determination of the referee "on the basis of the evidence previously submitted in the case, or direct the taking of additional evidence." We have consistently held for more than sixty years that this language vests the UCBR as the "ultimate fact finding body empowered to resolve conflicts in evidence, to determine the credibility of witnesses, and to determine the weight to be accorded the evidence." *See, e.g., Unemployment Compensation Board of Review v. Wright,* 21 Pa.Cmwlth. 637, 638–39, 347 A.2d 328, 329 (1975). *See also Peak v. Unemployment Compensation Board of Review,* 509 Pa. 267, 501 A.2d 1383 (1985).

We also note that, in *Belasco v. Board of Public Education,* 510 Pa. 504, 510 A.2d 337 (1986), our supreme court approved a two-tier system of administrative review in which the Secretary of Education conducted *de novo* review as opposed to reviewing a local school board's decision using the substantial evidence standard of review.

**23.** Although *Belasco* concerned a local school board's decision to dismiss a teacher, that case is apposite here because the District Board, in deciding Collegium's application, was not an "independent body." *See Belasco,* 510 Pa. at 514, 510 A.2d at 342.

**24.** Petitioners contend that the use of the term "due consideration" implies the General Assembly's intent to limit the CAB to an abuse of discretion standard. We disagree. That term simply means that the CAB must give **appropriate** consideration to the local school board's findings; it does not mandate a particular standard of review.

neutral factfinder at any stage of the proceedings, and minimum requirements of due process would not be met. *See Belasco.*[25]

Based upon the plain language of subsection 17–1717–A(i)(6) and due process requirements for an independent and impartial factfinder at some stage of the proceedings, the CAB did not err in conducting *de novo* review of the District Board's decision.

### C. Substantial Evidence

Petitioners also argue that the CAB erred when it summarily declared that the District Board's decision was not based on substantial evidence in the record and would have to be reversed even under the appellate standard of review advocated by Petitioners here. However, as previously determined, it is the CAB, not the District Board, that is the factfinder in an appeal from a charter application denial. Thus, the issue raised by Petitioners is irrelevant, and we will not consider it further.

### D. Regional Charter

█ Petitioners next argue that the CAB erred when it determined that Collegium was not required to apply for a charter to operate as a "regional charter school."[26] We disagree.

The CSL provides two possibilities for creating a charter school. Under section 1717–A of the CSL, an application to establish a single district charter school shall be submitted to the local board of school directors of the district where the charter school will be located, 24 P.S. § 17–1717–A(c), and that local board shall evaluate and grant or deny the application. 24 P.S. § 17–1717–A(e). Alternatively, under section 1718–A of the CSL, a multi-district regional charter school may be established, and the boards of school directors of one or more school districts may act jointly to receive and consider an application for a regional charter school. The applicant applies for a charter to the board of directors of any school district in which the charter school will be located. 24 P.S. § 17–1718–A(b).

Petitioners contend that Collegium intends to recruit from outside the School District and, in fact, will rely on non-resident students to make it viable. Thus, Petitioners argue that Collegium will operate as a "de facto" regional charter school and, as such, it was required to apply for a regional charter pursuant to section 1718–A of the CSL. Petitioners concede that a

**25.** Relying on subsection 1717–A(i)(6), which grants the CAB discretion to allow the parties "to supplement the record" on appeal "if the supplemental information was previously unavailable," Petitioners argue that, because there was no supplementation of the record here, the CAB was limited to determining whether the District Board abused its discretion. We disagree. In *Belasco*, our supreme court considered and rejected an identical argument with respect to the Secretary of Education's (Secretary) standard of review of a local school board's decision to dismiss a teacher. In that case, the local school board relied upon *Strinich v. Clairton School District*, 494 Pa. 297, 302 n. 3, 431 A.2d 267 (1981), in which our supreme court had commented that, where no additional testimony is taken, the Secretary's review is limited to a determination of whether the local school board abused its discretion. In *Belasco*, our supreme court explicitly overruled *Strinich*, explaining that the Secretary "is vested with the authority to conduct *de novo* review whether he takes additional testimony or merely reviews the official record of the proceedings before the board." *Belasco*, 510 Pa. at 515, 510 A.2d at 343. Thus, here, the fact that the record was not supplemented before the CAB is irrelevant.

**26.** Section 1703–A of the CSL, 24 P.S. § 17–1703–A, defines "Charter school" as an "independent public school established and operated under a charter from the local board of school directors and in which students are enrolled or attend. A charter school must be organized as a public, nonprofit corporation." "Regional charter school" is defined as "an independent public school established and operated under a charter from more than one local board of school directors and in which students are enrolled or attend. A regional charter school must be organized as a public, nonprofit corporation. Charters may not be granted to any for-profit entity." *Id.*

charter school may enroll students from outside the district that grants the charter. *See* section 1723–A(c) of the CSL, 24 P.S. § 17–1723–A(c). Nevertheless, Petitioners maintain that an applicant is not free to establish a charter school that is *designed* to serve students of numerous school districts but is based on the approval of, and accountability to, only one district's local board. Petitioners also argue that providing the applicant with total discretion in deciding whether to seek a regional charter or single district charter conflicts with the intent of the CSL's requirement that charter schools demonstrate sustainable support within a relevant community. *See* 24 P.S. § 17–1717–A(e)(2)(i). In other words, Petitioners contend that a charter applicant must be required to apply as a regional charter school when it depends on more than one school district for a significant portion of its "sustainable support." To hold otherwise, argue Petitioners, would render section 1718–A of the CSL mere surplusage and would enable applicants to evade scrutiny by affected school districts in contravention of the CSL's purpose to give voice, through their elected school boards, to parents and taxpayers impacted by a charter school.

The language of the CSL, however, does not support Petitioners' interpretation of the statute. We note that, unless the charter school will be located in more than one school district, which is not the case here, the CSL does not set forth any particular set of circumstances that would require a charter school applicant to apply as a multi-district regional charter school rather than a single district charter school. Instead, the CSL leaves that choice completely up to the applicant, regardless of the anticipated geographic makeup of the student body. Further, Petitioners' claimed need for further accountability provides no reason to rewrite the law. Because any Pennsylvania resident may attend any charter school, 24 P.S. § 17–1723–A(a), and because any charter school may draw students from outside its district, 24 P.S. § 17–1723–A(c), every charter school applicant could expect to admit nonresident students. Indeed, the General Assembly contemplated and provided for this possibility in the CSL and, thus, could have held charter schools accountable to any paying school district if the General Assembly thought it necessary. That the General Assembly did not do so indicates its belief that charter schools already are held sufficiently accountable to monitoring entities [27] and reflects the General Assembly's desire to free charter schools from unnecessary layers of bureaucracy. *See* 24 P.S. §§ 17–1702–A, 17–1715–A(1). Finally, because there are reasons why an applicant might opt to apply as a regional charter school,[28] Petitioners cannot succeed in their claim that the regional school charter requirements would be reduced to surplusage under the CAB's interpretation of the CSL.

---

27. Charter schools are already accountable under the CSL to "the parents, the public and the Commonwealth." Section 1715–A(2) of the CSL, 24 P.S. § 17–1715–A(2). In addition, the charter school is accountable to the local school board of the district in which the charter school is located. Specifically, the charter school must provide that district with ongoing access to the school's facilities and records to ensure compliance with the CSL, and the charter school must provide the local board with an annual report to facilitate review. 24 P.S. § 17–1728–A(a) and 17–1728–A(b).

28. As the CAB points out, the choice to seek a single district charter is not without its consequences to the applicant. Because single district charter schools must physically be in the district granting the charter, electing to apply for such a charter could restrict the school's choice of facility sites. Similarly, if an applicant intends to operate in more than one building, it might prove advantageous for that applicant to apply for a regional charter. Further, because single district charter schools must give preference to qualified students from the chartering district, 24 P.S. § 17–1723–A(a), schools designed to attract a multi-cultural student body or draw students from various socio-economic groups may be thwarted in their desire if the student demand is sufficient from the chartering school district. (CAB op. at 27–28.)

### E. Petition to Intervene

Next, we consider Taxpayers' argument that the CAB erred or abused its discretion in denying their petition to intervene. Taxpayer Miller is a taxpayer and resident of the Garnet Valley School District and Taxpayer Shreiner is a taxpayer and resident of the Downingtown Area School District. Both of these school districts are located within ten miles of the School District, the area in which Collegium plans to hold enrollment meetings to recruit students. (R.R. at 146a.) According to Taxpayers, Collegium's admission of students from Taxpayers' respective home districts will directly affect them as individuals because it will reduce the public funds available to these districts[29] and force the districts to raise taxes, reduce educational services or both. Thus, Taxpayers argue that they are entitled to intervene in this matter because, despite Collegium's admitted recruitment aims, Collegium submitted its charter school Application to the District Board only, thereby denying neighboring school districts any vote on the Application and any right to revoke or suspend Collegium's charter.

Section 35.28(a) of the General Rules of Administrative Practice and Procedure governs eligibility to intervene in an action and states in pertinent part as follows:

(a) *Persons.* A petition to intervene may be filed by a person claiming a right to intervene or an interest of such nature that intervention is necessary or appropriate to the administration of the statute under which the proceeding is brought. The right or interest may be one of the following:

(1) A right conferred by statute of the United States or of this Commonwealth.

(2) An interest which may be directly affected and which is not adequately represented by existing parties, and as to which petitioners may be bound by the action of the agency in the proceeding....

(3) Other interest of such nature that participation of the petitioner may be in the public interest.

1 Pa.Code § 35.28(a). After considering these factors, we conclude that the CAB properly refused to grant Taxpayers' petition to intervene.[30]

### 1. Statutory Right

■ The CSL itself clearly does not confer on Taxpayers the right to intervene in Collegium's appeal before the CAB. Indeed, the CSL authorizes only a charter school applicant to appeal to the CAB from the denial of a charter by the local school board. 24 P.S. § 17–1717–A. Other than the charter applicant and the local board of school directors, the CSL does not authorize any other parties' involvement in the appeal process.[31]

---

**29.** See sections 1725–A and 1726–A of the CSL, 24 P.S. §§ 17–1725–A and 17–1726–A.

**30.** This court has recognized that the grant or denial of a petition to intervene is within the sound discretion of the agency involved. *Pennsylvania Dental Association v. Insurance Department*, 122 Pa.Cmwlth. 241, 551 A.2d 1148 (1988). Moreover, our supreme court has stated that it will not disturb a determination on intervention unless there has been an abuse of discretion. *Wilson v. State Farm Mutual Automobile Insurance Co.*, 512 Pa. 486, 517 A.2d 944 (1986).

**31.** As the CAB noted, an appeal taken pursuant to the CSL is by the applicant whose charter was rejected by the local school board; the CSL does not provide for appeal from the *grant* of a charter. Thus, if the School District had granted Collegium's charter, Taxpayers would have been without statutory authority to appeal that decision. Obviously, the effect on Taxpayers' respective school districts would be the same whether the grant of Collegium's charter came from the School District in the first instance or from the CAB following an appeal. Logically, then, Taxpayers cannot intervene by statutory right in the appeal of Collegium's unsuccessful charter application. Instead, the School District must defend against its own decision, without participation from its own, or other districts', taxpayers.

■ Taxpayers argue, however, that their status as a party already had been established when the trial court granted their petition to intervene in Collegium's "Petition to Appeal" before that court.[32] Taxpayers contend that review by the CAB is not a separate proceeding; rather, it is the continuation of a single appeal process that began in the trial court and continued to the CAB. Thus, Taxpayers maintain that, once the trial court issued its order allowing Taxpayers to intervene,[33] they took on all the rights and liabilities of a party to the action for the balance of Collegium's appeal, *see* Pa. R.C.P. No. 2330(a), and the CAB could not deny them party status. We do not agree that the CAB was bound by the trial court's decision to grant Taxpayers petition to intervene.

As previously discussed, although submission of signatures to the trial court is part of the appeal process, this procedural step acts only to qualify a charter school applicant to pursue an appeal from a charter denial before the CAB. The "Petition to Appeal" filed with the trial court cannot be considered the actual appeal from a charter denial because the CAB, not the courts of common pleas, has exclusive review over such appeals. 24 P.S. § 17–1717–A(i)(1). Accordingly, when the trial court allowed Taxpayers to participate in the phase of the process dealing with the sufficiency of Collegium's "Petition to Appeal," it did not compel the CAB to recognize any right of Taxpayers to act as parties in the CAB's proceedings on the merits of Collegium's appeal. Instead, the trial court's grant of permission to intervene ended with that decision.

## 2. Directly Affected Interest

■ Taxpayers also maintain that they have demonstrated an interest which is substantially, directly and immediately affected by the CAB's decision. Specifically, Taxpayers assert that the CAB's decision to implement the charter school will impose a legally enforceable obligation on Taxpayers' school districts to pay Collegium for any students from those districts that enroll at Collegium. As a result, Taxpayers contend that their school districts' revenue will be diminished, necessitating either increased taxes or decreased services. Therefore, Taxpayers claim that the CAB's denial of the petition to intervene amounts to taxation without representation. However, because Taxpayers' claimed harm is based solely on speculation, their interests are too remote and indirect to establish their eligibility to intervene in the proceedings before the CAB.

The situation here can be compared to that in *Wilkinsburg Education Associa-*

---

**32.** In fact, it was pursuant to the trial court's order that counsel for Taxpayers entered their appearance before the CAB. (R.R. at 337a.) However, counsel for Taxpayers was advised that, because the CAB had not yet had the opportunity to develop its own procedural rules, Taxpayers should file a petition to intervene in accordance with the General Rules of Administrative Practice and Procedure in Title 1 of the Pennsylvania Code. (R.R. at 339a.) Taxpayers followed this suggestion; however, they stated that they were submitting the petition to intervene without prejudice to their rights as parties already conferred by the trial court. (R.R. at 326a.)

**33.** Taxpayers note that, if Collegium had submitted its Application for a regional charter school, as allegedly required under section 1718–A of the CSL, Taxpayers' elected school boards automatically would have been parties to Collegium's appeal and, thus, able to protect the interest of their districts' taxpayers and residents. Indeed, according to Taxpayers, the trial court's decision to grant their petition to intervene conferred on Taxpayers the "right" under section 1718–A of the CSL to protect that interest. We note the overlap between Taxpayers' argument here and Petitioners' last argument, that is, the claim that Collegium was required to apply for a regional charter which would give Taxpayers' elected school boards the statutory right to rule on the charter application under the CSL's provisions. *See* 24 P.S. § 17–1718–A. However, we already have determined that Collegium was not required to submit its Application as a regional charter school, thus eliminating this argument as a basis for Taxpayers' alleged right to intervene.

*tion v. Wilkinsburg School District,* 690 A.2d 1252 (Pa.Cmwlth.1996). In that case, a school district requested approval from the Department of Education (Department) to alter the educational program at one of the district's elementary schools by delegating the school's operation to an outside corporation. A teachers' association sought to intervene and participate in the Secretary of Education's (Secretary) evaluation of the school district's request, arguing that, because the *outside corporation* would hire its own teachers, approval of the school district's request would require the furloughing of some teachers who were association members. We affirmed the Department's denial of intervention on the ground that the interests of the teachers' association would not be directly affected or bound by the Secretary's response to the school district's request. In reaching this conclusion, we noted that the Secretary's approval was limited to giving the school district discretion to alter the program and did not authorize the furloughing of teachers. Further, we pointed out that the Secretary's approval itself did nothing to change the employment status of the association's members; any teacher furloughs would result directly from subsequent actions taken by the school district.

Here, as in *Wilkinsburg,* Taxpayers' interests will not be directly affected by the CAB's decision to grant Collegium's appeal. Indeed, Taxpayers' interests are several steps removed from any action by the CAB and, thus, will be affected only if numerous *possibilities* are realized following the grant of Collegium's charter. In fact, the order to grant Collegium's charter binds only the School District; it does not require students from Taxpayers' school districts to attend Collegium. Although Collegium intends to recruit students from Taxpayers' school districts, there is no assurance that any particular number of students will actually choose to attend Collegium. Moreover, even if students from outside the School District do attend Collegium, there is no proof that the loss of students will have an adverse financial impact on Taxpayers' districts.[34] Finally, even assuming that Taxpayers' school districts suffer such financial consequences, there is no way of determining whether the added costs would be extensive enough to require the local school boards in Taxpayers' districts to either raise taxes or reduce services.[35] In short, ordering a school district to grant a charter to a charter school will not directly affect Taxpayers. The students in Taxpayers' school districts still decide for themselves if they wish to enroll at Collegium, and the local board of directors in each school district determines whether taxes will be raised, whether there will be a reduction in services or both.[36] These decisions are not made by the CAB.

Nevertheless, Taxpayers argue that the CAB's reliance on *Wilkinsburg* is misplaced because, in *Wilkinsburg,* the De-

**34.** As the CAB pointed out, Taxpayers' arguments do not consider the possibility that the loss of students actually might reduce expenses in their school districts. Moreover, as we pointed out previously, the General Assembly clearly contemplated that charter schools would admit students from outside the district in which they are located and provided that school subsidy money would flow from these school districts to the charter schools. Nevertheless, the General Assembly did not grant these paying school districts the right to intervene in the CAB appeal process.

**35.** Moreover, if the school boards in Taxpayers' districts do increase taxes or reduce services, it would likely be as a result of a multi-

tude of factors, not just the direct result of the CAB authorizing Collegium's charter.

**36.** Thus, the CAB refutes Taxpayers' cry of taxation without representation by pointing out that Taxpayers can vote in elections for their respective boards of school directors. Taxpayers argue that the CAB ignores the fact that, no matter who is elected to serve as school directors in the Taxpayers' districts, diversion of tax dollars to Collegium will be legally unavoidable and would leave the school directors with no choice but to raise taxes and/or cut programs. As we have already stated, this "fact" is based on speculation.

partment's decision merely *authorized* the school district to take action which, *if implemented,* would result in teacher job losses. Taxpayers point out that, here, the CAB decision actually *implemented* the harm by *directing* that the charter be issued, thereby imposing a binding, legally enforceable obligation on Taxpayers' school districts under the CSL. We are not persuaded by the distinction urged by Taxpayers.

Although the school district in *Wilkinsburg* possessed discretion that the School District here does not share, this does not mean that the CAB's order affected Taxpayers any more directly than the Secretary's decision in *Wilkinsburg* affected the teacher's association. In fact, Taxpayers' alleged interests here are even further removed. In *Wilkinsburg,* the school district specifically admitted that several of its professional employees would be furloughed under the requested education program; thus, the harm asserted by the association was only one short step removed from the Secretary's approval of the request. If the school district exercised its discretion to alter the program, then currently employed association members would lose their jobs. The connection here is far more attenuated. Although, in granting Collegium's appeal, the CAB obligates the School District to issue Collegium's charter, as previously stated, there is no evidence that any harm will befall Taxpayers as a direct result of this action. Moreover, contrary to Taxpayers' assertion, the CAB's decision imposes no obligation on Taxpayers' school districts under the CSL.

Taxpayers' interests, based only on a *possibility* that taxes and services would be adversely affected, are too remote to provide a basis for intervention. Further, any change in taxes or services in neighboring school districts would be the direct result, not of the charter grant itself, but of those school districts' response to that grant. Accordingly, because Taxpayers have not shown an interest that would be directly affected or bound by the CAB's action in this matter, we conclude that the CAB did not abuse its discretion in denying Taxpayers' petition to intervene under 1 Pa.Code § 35.28(a)(2).

### 3. Public Interest

■ Taxpayers assert that they should be allowed to intervene because their participation would be in the public interest. Taxpayers reason that, because this case will set the precedent on regional charter application requirements, the issue needs aggressive litigation, and because Taxpayers' interest in that issue exceeds that of the School District, no party is better situated than Taxpayers to argue that issue.[37] Again we disagree.

We are well aware that the regional charter school issue is a new one; however, that fact does not provide Taxpayers with a right to intervene in this appeal that they would not otherwise have. We agree with the CAB that Taxpayers' argument that they will be subjected to increased taxes or a reduction in services does not evidence an interest of such a nature that intervention may be in the public interest. Further, because they have established no interest beyond that asserted by the School District, we believe that Taxpayers' interests are adequately served by the School District's opposition to the charter grant.

37. Taxpayers contend that because the School District already has the right to rule on the charter, and because the School District does not have to pay the additional cost of transporting students outside its district, Taxpayers' interests exceed that of the School District on the issue of the need for a regional charter. Therefore, Taxpayers claim that they should be allowed to intervene because their interests are not adequately represented by the School District. We note, however, that the School District does not set forth its own separate argument on the regional charter school issue. Instead, the School District fully incorporates into its brief the entire argument set forth in Taxpayers' brief. Thus, we actually have addressed Taxpayers' arguments on this issue.

Having concluded that Taxpayers were properly excluded as parties to this action, we affirm the CAB's denial of Taxpayers' petition to intervene.

### F. Non–Profit Corporation

■ Finally, Petitioners argue that the CAB erred when it failed to reject Collegium's charter school Application on the basis that Collegium is not an independent, public, non-profit corporation, but is, in fact, a profit-making conduit for Mosaica. However, like the CAB, we conclude that the record does not support Petitioners' claim that Collegium is a mere shell for a for-profit entity rather than a non-profit corporation.

The CSL provides that a charter may be *granted* only for a school organized as a public, non-profit corporation; charters may not be granted to any for-profit entity. Sections 1703–A and 1720–A of the CSL, 24 P.S. §§ 17–1703–A and 17–1720–A. Yet, there is no question that the CSL permits a charter school to be *established* by "any corporation," even if that corporation is a for-profit entity. *See* Sections 1717–A(a) and 1718–A(a), 24 P.S. §§ 17–1717–A(a) and 17–1718–A(a). Therefore, as conceded by Petitioners, Mosaica was legally eligible to complete and submit the charter Application for Collegium. (*See* Taxpayers' brief at 44.) Clearly, however, the legislature did not want to entrust the management and operation of the charter school itself to entities seeking to make money from the school's management and operation; rather, that power is granted to the charter school's board of trustees who, as public officials,[38] have a single purpose to promote the interests of pupils. To this end, section 1716–A(a) of the CSL vests the charter school's board of trustees with the "authority to decide matters related to the operation of the school, including, but not limited to, budgeting, curriculum, and operating procedures, subject to the school's charter." In addition, the trustees have "the authority to employ, discharge and contract with necessary professional and nonprofessional employes subject to the school's charter." 24 P.S. § 17–1716–A(a). The board of trustees also determines the level of compensation and all terms and conditions of staff employment. Section 1724–A of the CSL, 24 P.S. § 17–1724–A(a). However, the CSL does not prohibit charter schools from contracting out certain management and administrative responsibilities to a for-profit corporation. Rather, the CSL grants charter schools all powers necessary or desirable for carrying out its charter, including, but not limited to, the power to acquire real property by purchase or lease and the power to make contracts or leases for the procurement of services, equipment and supplies.[39] Sections 1714–A(a)(3) and 1714–A(a)(5) of the CSL, 24 P.S. § 17–1714–A(a)(3) and 17–1714–A(a)(5). Thus, as the CAB properly concluded,

> nothing in the [CSL] prohibits the involvement of for-profit entities in the establishment and operation of a charter school, so long as the school itself is not for-profit, the charter school's trustees have real and substantial authority and responsibility for the educational decisions, and the teachers are employees of the charter school itself.

(CAB op. at 23.)

Here, Petitioners argue that charter school trustees must function as fiducia-

---

**38.** Section 1715–A(11) of the CSL, 24 P.S. § 17–1715–A(11).

**39.** Commenting upon this grant of power, the CAB concludes:

> it is unrealistic to expect individuals who wish to provide alternate educational opportunities in their local school districts to themselves be professional educators or experts in the field of education. For a char-

ter school founder and trustees to contract with commercial educational service providers for the expertise and skills needed to operate a school, as well as for propriety curriculum and educational materials and methods that match the trustees' visions and goals, is reasonable and well within the structure of the [CSL.]
(CAB op. at 23.)

ries for the school and, therefore, must perform their duties in good faith in a manner that is in the school's best interest.[40] Petitioners acknowledge that the CSL unquestionably authorizes a charter school to contract with for-profit entities, such as Mosaica. However, Petitioners contend that Collegium's trustees will be unable to perform as fiduciaries because they will not have ultimate control over major decisions affecting the school but, instead, will be controlled by Mosaica, a for-profit corporation.

Petitioners maintain that Collegium is not independent of Mosaica, and the decisions to contract with Mosaica were not based on the independent judgment of Collegium's trustees but, instead, were included in the charter Application written by Mosaica before the board of trustees even had been appointed.[41] According to Petitioners, the decisions to which the charter Application committed Collegium's board of trustees all were geared to making money for Mosaica out of tax dollars which the School District will have to pay Collegium. Further, Petitioners assert that Collegium's board of trustees cannot realistically declare their independence from Mosaica and take ultimate control of the school because the trustees are legally bound by the charter provisions. See section 1720–A of the CSL, 24 P.S. § 17–1720–A. In short, Petitioners contend that Collegium's board of trustees cannot satisfy its statutory duties when the most critical decisions about the charter school were made before the trustees were appointed and are beyond the trustees' ability to change.

After a review of the record, we agree with the CAB that there is nothing to indicate that the arrangement between Mosaica and Collegium would deprive Collegium's trustees of ultimate control of the charter school, and we see nothing in the CSL to prevent a for-profit entity such as Mosaica from assuming the role that it will have here. Specifically, Collegium's articles of incorporation state that Collegium is organized as a non-profit corporation under Pennsylvania law. (R.R. at 149a–54a.) Further, Collegium's bylaws and its charter school Application both state that the board of trustees has full authority to operate the school, including determining general, academic, financial, personnel and other policies, as outlined in the CSL. (R.R. at 138a, 143a–44a, 157a–58a, 163a, 166a.) In addition, Mosaica's agreement with the charter school in Bensalem, which was represented as a model for the agreement between Mosaica and Collegium, makes clear that the board of trustees is independent from Mosaica and that Mosaica can exercise no authority which may not be delegated by the School Code and other applicable laws and resolutions. (R.R. at 183a–85a.) Mosaica representatives also

40. Although the term public non-profit corporation is not defined in the CSL, Petitioners urge that we use the definition of "corporation not-for-profit" found in section 5103 of the Nonprofit Corporation Law of 1988(NCL), 15 Pa.C.S. § 5103, and define the term to mean "a corporation not incorporated for a purpose or purposes involving pecuniary profit, incidental or otherwise." Petitioners then reason that the provisions of the NCL which relate to a "board of directors" or alternative "other body" of a non-profit corporation also apply to the "board of trustees" of a charter school, see sections 5103 and 5721 of the NCL, 15 Pa.C.S. §§ 5103 and 5721. Specifically, Petitioners refer to section 5712(a) of the NCL, which provides that a member of the board of directors or other body of a non-profit corporation stands in a fiduciary relationship to the corporation and must perform his or her duties in good faith; in a manner he or she reasonably believes to be in the best interests of the nonprofit corporation, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. 15 Pa.C.S. § 5712(a).

41. Petitioners contend that when Mosaica submitted the charter Application, it was not responding to any expressed need for alternative education from any member of the School District. Rather, Mosaica itself sought out John Prader to act as Collegium's "founder"—to submit the charter Application on Mosaica's behalf and to appoint as trustees individuals who would share the Mosaica philosophy and adhere to the charter Application written by Mosaica.

responded to concerns of the District Board, assuring the District Board that none of Collegium's board of trustees would have any financial interest in, or receive compensation from, Mosaica, and that the trustees retained the power to negotiate the terms of the contract with Mosaica and to terminate that contract. (R.R. at 176a–77a.)

Petitioners complain that major decisions were made and included in the charter Application before the selection of the board of trustees; however, it appears that the CSL envisions that a charter school's board of trustees would not be selected until *after* the charter application was filed. In fact, the CSL provides that an application to establish a charter school shall include "[t]he proposed governance structure of the charter school, including a description and *method for the appointment or election of members of the board of trustees.*" Section 1719–A(4) of the CSL, 24 P.S. § 17–1719–A(4). Thus, it follows that all of the items listed for inclusion in the charter application[42] will be determined without input from the board of trustees. Further, the board of trustees is authorized under the CSL only to decide matters relating to the *operation* of the school *subject to the school's charter,* 24 P.S. § 17–1716–A(a); thus, the CSL clearly anticipates that a charter school's board of trustees will manage and operate the school *after* the grant of the charter. Because the facts do not support Petitioners' argument that Collegium is not an independent, non-profit school, the CAB did not err in concluding that the arrangement between Mosaica and Collegium is within the bounds envisioned and permitted by the CSL.

For all these reasons, we affirm the CAB's order reversing the District Board's denial of Collegium's charter school application.

---

**42.** Section 1719–A of the CSL, 24 P.S. § 17–1719–A, lists seventeen items of information required for inclusion in an application to establish a charter school.

## II.

### September 29, 1999 Order[43]

 Consolidated with the case just discussed is the School District's challenge to the determination of the CAB and Eugene W. Hickok, Chairperson of the CAB/Secretary of the Pennsylvania Department of Education (Chairman Hickok), to deem Collegium's charter approved and to Chairman Hickok's September 29, 1999 execution of that charter. The issue is whether Chairman Hickok properly acted within his discretion under the CSL when he signed the charter for Collegium. As an aid to understanding this issue, we briefly restate some of the facts of the case.

Collegium filed a charter school Application, which the District Board denied on February 22, 1999. Collegium appealed the denial to the CAB, and, on August 27, 1999, the CAB *voted* to reverse the District Board's decision. Under section 1717–A(i)(9) of the CSL,

[a] decision of the appeal board to reverse the decision of the local board of directors shall serve as a requirement for the local board of directors of a school district or school districts, as appropriate, to grant the application and sign the written charter of the charter school as provided for in section 1720–A. *Should the local board of directors fail to grant the application and sign the charter within ten (10) days of notice of the reversal of the decision of the local board of directors, the charter shall be deemed to be approved and shall be signed by the chairman of the appeal board.*

24 P.S. § 17–1717–A(i)(9) (emphasis added).

---

**43.** References to the reproduced record made in this portion of the opinion are to the record created for the case docketed at 2730 C.D. 1999.

On August 30, 1999, the School District filed an appeal with Commonwealth Court from the August 27, 1999 decision, accompanied by an application for stay. Concerned that the CAB's August 27, 1999 *vote* triggered the ten-day period for granting Collegium's charter, the School District also filed a motion for expedited decision of its stay application. This court quashed the School District's appeal as premature because the CAB had not yet issued a written decision. The CAB subsequently issued its written decision on September 7, 1999, and, on September 10, 1999, the School District filed its appeal from that decision in this court, along with an application for stay and a motion for expedited disposition. On September 15, 1999, in an effort to comply with section 1717–A(i)(9) of the CSL and avoid a deemed approval of Collegium's charter, the District Board met in a public meeting to approve a charter for Collegium. On September 17, 1999, the District Board President and Secretary executed the charter for Collegium (District Charter). However, *the grant of the charter was specifically subject to various additional conditions, standards and procedures.* (R.R. at 26a–29a.) On September 20, 1999, we granted the School District's application for stay; [44] however, the Supreme Court reversed this grant of stay on September 28, 1999. On September 29, 1999, Chairman Hickok separately executed a charter for Collegium by operation of law (Hickok Charter); *the Hickok Charter did not contain the conditions that appeared in the District Charter.* (R.R. at 43a–44a.) Chairman Hickok claimed authority for this action pursuant to the deemed approval provisions in section 1717–A(i)(9) of the CSL because the District Board failed to grant a charter within ten days of receiving notice of the CAB's August 27, 1999 *vote* to reverse the denial of Collegium's charter school application.

The School District contends that Chairman Hickok, acting on behalf of the CAB, committed an abuse of discretion and error of law when he deemed Collegium's charter approved and executed the Hickok Charter for Collegium.

First, the School District argues that, because the District Charter, signed on September 17, 1999, was executed within the requisite ten-day period, Chairman Hickok's decision to ignore the District Charter was an abuse of discretion. The School District maintains that, contrary to the CAB's determination, the ten-day deemed approval period did not begin on August 27, 1999, when the CAB voted to reverse the District Board's denial of Collegium's charter school application. Rather, the School District contends that the approval period commenced on September 8, 1999, when the School District received the CAB's September 7, 1999 reversal order. In support of its position, the School District relies on this court's decision to quash the School District's appeal from the CAB's August 27, 1999 vote. According to the School District, our ruling implies that the August 27, 1999 vote was not the binding decision of the CAB and that a written opinion and order were required. Further, the School District points to statements from Chairman Hickok's Assistant Counsel, Ernest Helling, indicating that the ten-day deemed approval period began on September 8, 1999 and expired on September 20, 1999. (R.R. at 38a–39a, 42a.)

44. Also, by letter dated September 20, 1999, Collegium asked Chairman Hickok, as Chairperson of the CAB, to sign Collegium's charter, stating that the District Board had not issued a charter in conformity with the CAB's decision within the required 10–day approval period. Collegium explained that the District Charter proposed by the District Board failed to comply with the CAB's decision because that charter contained conditions that went beyond the requirements of the CSL. (R.R. at 3a–5a.) On September 22, 1999, Ernest N. Helling, Department of Education Assistant Counsel and Solicitor to the CAB, informed the parties that Chairman Hickok would not sign a charter because of the grant of the request for stay; however, Helling indicated that, because of its conditions, the District Charter did not satisfy the CAB's decision. (R.R. at 38a–39a.)

The School District also contends that, if Chairman Hickok's indifference to the District Charter was predicated on a determination that these conditions were illegal or unreasonable and, thus, rendered the District Charter invalid, the CAB erred or abused its discretion. Rather, the School District maintains that the conditions included in the District Charter were entirely appropriate under the CSL. Indeed, according to the School District, a local school district is obligated under section 1720–A of the CSL, 24 P.S. § 17–1720–A, to *develop* terms, conditions and procedures within a legally binding charter. Section 1720–A provides in relevant part:

> Upon approval of a charter application under section 1717–A, a written charter shall be *developed* which shall contain the provisions of the charter application and which shall be signed by the local board of school directors of a school district ... or by the chairman of the appeal board pursuant to 1717–A(i)(5) and the board of trustees of the charter school. This written charter, when duly signed ... shall act as legal authorization for the establishment of a charter school.

24 P.S. § 17–1720–A (emphasis added). *See also* section 1729–A(a)(1) of the CSL, 24 P.S. § 17–1729–A(a)(1). Thus, the School District asserts that the CAB's substitution of the Hickok Charter for the District Charter constituted an impermissible infringement on the constitutional and statutory duties placed upon the District Board. We disagree and conclude that Hickok's signing of Collegium's charter was a proper exercise of his authority as granted by the CSL.

First, we conclude, as did the CAB, that the District Board did not sign the charter within the statutory ten-day period. It is indisputable that the School District had actual notice of the CAB's decision to reverse the District Board on August 27, 1999. Indeed, the School District itself recognized the possibility that the ten-day period began with notice of the August 27,

1999 decision by the CAB. Under the plain language of section 1717–A(i)(9), the CSL requires only *notice* of the reversal of the decision of the local board to begin the ten-day deemed approval period. Because the CSL does *not* require written notice or notice of a written decision, the CAB properly interpreted the statutory language when it determined that the deemed approval period began to run on August 27, 1999, rather than on September 8, 1999. The School District's reliance on this court's quash order to support a contrary position is misplaced because, although receipt of a written decision is required before the decision may be reviewed, an oral decision is still a valid, final adjudication. *See Bruno v. Zoning Board of Adjustment of the City of Philadelphia*, 664 A.2d 1077 (Pa.Cmwlth.1995). Finally, any attempts by the School District to attach significance to Assistant Counsel Helling's statements must fail. Such statements cannot supplant the decision made by Chairman Hickok and the CAB; moreover, the statements were made long after the time to act had expired. Thus, Collegium's charter was properly deemed approved by the CAB.

Alternatively, even assuming that the District Charter was timely executed, we would agree that it was invalid. In the District Charter, the District Board attempted to impose on Collegium conditions which were not part of the CAB's September 7, 1999 order and which both exceeded and were inconsistent with the CSL. Thus, Chairman Hickok was authorized to sign the Hickok Charter as a substitute for the District Charter.

Here, the District Charter contained conditions that placed regulatory burdens on Collegium not permitted by the CSL. We understand that the School District views the conditions as reasonable and considers them as necessary aids to the District Board's oversight powers. However, we also recognize that restricting the power of the local school board to regulate charter schools through the imposition of

conditions in the charter is consistent with the legislative intent to provide for schools that operate independently of the existing school district structure, 24 P.S. § 17–1702–A. Under the CSL, the legislature relieves charter schools of many state mandates. To grant the District Board the authority it claims under the CSL and have the District Board require charter schools to live up to those mandates at a local level would defeat the very purpose of the CSL. We do not suggest that charter schools should not be held accountable; however, that does not mean that the state mandates from which the legislature has relieved charter schools may be reloaded and imposed at a local level.

For all the foregoing reasons, we affirm the CAB's order reversing the denial of Collegium's charter application by the District Board, and we affirm the decision of Chairman Hickok to execute the Hickok Charter for Collegium.

## ORDER

AND NOW, this 25th day of August, 2000, the order of the State Charter School Appeal Board (CAB), dated September 7, 1999, is hereby affirmed. Further, the decision of Eugene W. Hickok, acting in his capacity as Chairman of the CAB, dated September 29, 1999, is hereby affirmed.

Senior Judge McCLOSKEY dissents.