**MOSAICA EDUCATION, INC., Petitioner**

v.

**PENNSYLVANIA PREVAILING WAGE APPEALS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 6, 2007.

Decided May 8, 2007.

Reargument Denied July 3, 2007.

---

Mary B. Halfpenny, Philadelphia, for petitioner.

No appearance entered on behalf of respondent.

Peter Von Getzie, Asst. Counsel, Harrisburg, for intervenor, Bureau of Labor Law Compliance.

Irwin W. Aronson, Harrisburg, for intervenor, Pennsylvania State Building and Construction Trades Council, AFL–CIO.

BEFORE: COLINS, Judge, COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

This case returns to the Court after we remanded it to the Prevailing Wage Ap-

peals Board (Board) for additional factual development and analysis. At issue is whether the Pennsylvania Prevailing Wage Act [1] (Wage Act) is applicable to the renovations of the building (Property) used by the Ronald H. Brown Charter School (School) in Harrisburg.[2] As articulated in our earlier decision, this case presents:

> a possible statutory conflict between definitions in the [Wage Act], which make that act applicable only to "public bodies" using "public funds," and a mandate in Section 1715[-]A(10)(iii) of the Charter School Law [ (CSL) Act of March 10, 1949, P.L. 30, added by Section 1 of the Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. § 17–1715–A], that requires the Wage Act to be applied to "construction projects and construction-related work" for charter schools, seemingly without regard to the fact that a charter school does not meet the definition of a "public body" under the Wage Act, **and that construction projects pertaining to such a school cannot utilize public funds.**

*Mosaica Education, Inc. v. Pennsylvania Prevailing Wage Appeals Board* (*Mosaica I* ), 836 A.2d 185, 186 (Pa.Cmwlth.2003) (footnotes omitted) (emphasis added). We note that, after our decision in *Mosaica I*, the legislature repealed the prohibition against a charter school utilizing public funds for construction projects.[3]

The School contracted with the Delaware for-profit corporation Mosaica Education, Inc. (Mosaica) to provide manage-

ment services for the School. The School entered into a lease of the building with EFA Company, LLC (EFA), a Michigan-based limited liability company of which Mosaica is the sole shareholder. EFA had previously acquired the building used by the School, and Mosaica made renovations to it in preparation for its use as a school. The Department of Labor and Industry, Bureau of Labor Law Compliance (Department) determined that the renovations were made for the benefit of the School and were subject to the Wage Act. Mosaica grieved that decision.

In the prior litigation, and again in the present appeal, Mosaica argues that the Wage Act did not apply to it since the Wage Act only applied to "[b]oards of trustees and contractors of charter schools," Section 1715–A(10) of the CSL, 24 P.S. § 17–1715–A(10), and Mosaica was neither; at the time the renovations were conducted, it did not have a formal contract with the School and used no public funds for the renovations.

On appeal, this Court sitting en banc affirmed the Board's decision to the extent that it held that the Wage Act was applicable to charter schools, but otherwise vacated the Board's order and remanded the matter for further factual development.[4] We noted that, while there were three contracts involved in this case, the record only contained evidence regarding two of them: a management agreement between Mosaica and the School, and a lease agreement between the School and EFA. We

1. Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. §§ 165–1–165–17.

2. At argument, the parties acknowledged that the School is no longer in operation.

3. This prohibition had been at subsection (c) of Section 1722–A. 24 P.S. § 17–1722–A(c). Subsection (c) was repealed by the Act of July 4, 2004, P.L. 536, No. 70, § 18.

4. We also directed the Board to determine if the project exceeded $25,000, and to apply the same criteria in deciding this case as it would to a construction project involving a traditional public school. The evidence subsequently presented clearly established that the $25,000 threshold was met.

concluded that further factual development as to the third contract, a construction contract, was necessary to "address the argument that the [Trustees] did not enter into the construction contract, as well as to consider whether such a defense is consistent with its interpretation of the [Wage] Act." *Mosaica I*, 836 A.2d at 190. We also directed the Board to "address the question of whether there are close ties among the School, Mosaica and EFA such as would justify the imposition of the prevailing wage or the piercing of the corporate veil. . . ." *Id.*

On remand, the Board conducted a hearing on December 7, 2004, at which documentary evidence, including the construction contract,[5] was entered into the record and at which the sole witness was Gene Eidelman, Chief Operating Officer (COO) for Mosaica. Following the hearing, the Board issued an order and decision in which it concluded that the Wage Act did apply. Mosaica challenges that decision. In the present appeal, we must address: (1) whether Mosaica was a "contractor" under the CSL, which requires "contractors of charter schools" to comply with the Wage Act's provisions for construction projects and construction-related work; and (2) even if Mosaica was not a "contractor," must it nonetheless comply with the Wage Act under the facts of this case.[6]

I.

A.

In our previous opinion, we extensively discussed the facts of this case. Here, we focus on the facts developed by the Board on remand that are applicable to this appeal. Those facts involve the terms of the construction contract as drawn from the documentary evidence and the nature of the relationships between the School, Mosaica, and EFA as drawn from the testimonial evidence.

At the hearing, Mosaica introduced into evidence a copy of the construction contract, the terms of which revealed that it was entered between Mosaica and Ritter Brothers on July 19, 2000, for the renovation of the Property. The contract also indicated that Mosaica was paying for the renovation.[7] It was not until August 7, 2000, that Mosaica and the School entered into a management agreement. On that same day, EFA and the School entered a lease agreement for the Property.

At the hearing Mosaica also presented Eidelman's testimony, which essentially indicated that, while Mosaica and EFA had clear, formal connections with each other (Mosaica was EFA's sole shareholder), neither had formal connections with the

---

5. Mosaica presented an unsigned copy of the agreement because the original had been lost.

6. "Our scope of review is limited to a determination of whether constitutional rights have been violated, whether the adjudication was in accordance with the law, and whether the Board's findings of fact are supported by substantial evidence." *Lycoming County Nursing Home Ass'n, Inc. v. Department of Labor and Industry, Prevailing Wage Appeal Board*, 156 Pa.Cmwlth. 280, 627 A.2d 238, 241 n. 4 (1993).

7. In early spring of 2000, Mosaica and the construction contractor, Ritter Brothers, began negotiations. On June 7, 2000 EFA purchased the Property. On June 8, 2000, Ritter Brothers began renovating the Property. After that, on July 19, 2000, Mosaica and Ritter Brothers entered into the construction contract. The construction contract identified the parties to the contract, which were "the Owner," Mosaica; "the Contractor," Ritter Brothers, Inc.; and identified "the Project" as "RONALD H. BROWN CHARTER SCHOOL . . . RENOVATION TO FORMER MEDICAL ARTS BUILDING. . . ." (Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum, Reproduced Record (R.R.) at 516a.)

School until *after* Mosaica contracted for the renovation work.

Eidelman testified that Mosaica provides education services to charter schools and that EFA is the owner of several properties that are leased to charter schools. EFA is a limited liability company whose "sole partner" is Mosaica. Eidelman also testified that Mosaica has helped other charter boards obtain a charter for their schools, and that EFA has undertaken renovations of buildings for schools prior to entering into formal contracts with the respective schools. (Board Hr'g Tr. (Tr.) at 63, Dec. 7, 2004; Reproduced Record (R.R.) at 507a.)

In response to questions regarding the nature of the relationship between Mosaica and the School, Eidelman testified that Mosaica did not have a contractual relationship with the School until August 2000, but that in the years before there had been *informal* meetings. According to Eidelman, the informal meetings were not for developing plans for a charter school in Harrisburg, but "[f]or the purpose of determining education vision for kids in Harrisburg." (Tr. at 55–57, R.R. at 499a—501a.) He also testified that there is no common ownership or board members between EFA and the School. (Tr. at 23; R.R. at 467a.)

As to the Property, Eidelman testified that EFA purchased the Property "so that it could be leased and used for educational purposes." (Tr. at 15; R.R. at 459a.) Specifically, the intention was to turn the Property into a charter school for kindergarten through 5th grades. (Tr. at 44, 59; R.R. at 488a, 503a.) However, he testified that the School was not involved in any way in the financing of the purchase or renovations of the Property (Tr. at 16; R.R. at 460a), and that the Board of Trustees of the School (Trustees) was unaware of the building renovation specifications.

(Tr. at 58; R.R. at 502a.) When asked who paid for the project, Eidelman answered "Mosaica Education, so EFA paid for this." (Tr. at 23; R.R. at 467a.)

Eidelman also testified that he did not remember when EFA and the School commenced negotiations for the lease, although he stated "[i]t would have been shortly before the lease was entered into." (Tr. at 57; R.R. at 501a.) Prior to the lease agreement, there was no agreement between the School and either EFA or Mosaica to lease the Property, and the School was free to use a different property. (*See* Tr. at 59; R.R. at 503a.) The lease agreement for the Property between EFA and the School was for a five-year term and, at the conclusion of the lease term, the School would not have any interest in the Property. (Tr. at 24; R.R. at 468a; Lease Agreement between EFA, Landlord, and School, Tenant, R.R. at 27a.) Other than the lease agreement and the management agreement, there were no other written agreements between the School and either Mosaica or EFA. (Tr. at 29, 64; R.R. at 473a, 508a.) When asked about Mosaica's renovating the School prior to having a formal lease agreement, Eidelman stated that Mosaica "took a huge risk" that it "could have been stuck with the building without any tenants" if the charter was not approved. (Tr. at 59; R.R. at 503a.) He subsequently testified that, even if the School did get the charter, it still could have used another property and that the School was not tied to the Property in question. (Tr. at 59–60; R.R. at 503a–504a.)

## B.

On August 14, 2006, the Board issued its decision, finding that the work performed for the School was covered under the Wage Act. The Board noted that in *Brackbill v. Ron Brown Charter School,* 777

A.2d 131 (Pa.Cmwlth.2001), this Court found the Trustees were independent of Mosaica for purposes of being an independent, public, not-for-profit entity, enabling them to hold a charter. The Board noted that the Wage Act presents "distinctly different public policies" than those involved in *Brackbill* and that, for purposes of the Wage Act, the crucial fact was that the Charter Board contracted with Mosaica to manage the day-to-day operations of the School. (Board Final Decision and Order at 17, Aug. 14, 2006.) The Board found that EFA, Mosaica, and the Trustees had such close ties that the corporate veil could be pierced, and the fact that the Trustees were not parties to the construction contract was not an applicable defense.

In explaining its decision, the Board found that the documentary evidence demonstrated that an agreement existed between the School and Mosaica prior to the renovations of the building, even though the School may not have formally signed a management agreement with Mosaica until August 7, 2000. The Board found evidence of this agreement from the inception of the School, through the period up to the entry of the formal agreement. The Board found that Mosaica assisted with the School's initial application in 1998, and that the School, in this application, explicitly indicated that it would be contracting with Mosaica to provide administrative and instructional services. The Board also found evidence of a tacit agreement between Mosaica and the School, from internet-based materials, including a reference on the Mosaica website that it operated the School, and that the School's email address had Mosaica in it, "partner@mosaicaeducation.com." The Board, thus, found a close relationship between the School and Mosaica.

The Board similarly found a close relationship between Mosaica and EFA. The Board found that Mosaica shares common ownership with the School's landlord, EFA, and is EFA's only shareholder. This common ownership is identified in the lease agreement.[8] Also evident from the lease agreement is that EFA shared the same corporate address as Mosaica and that EFA's "Authorized Representative," who signed the lease on its behalf, was in fact Mosaica's COO, Gene Eidelman. Thus, the Board found a close relationship between Mosaica and EFA.

Relying on the close relationships it found between the parties, the Board concluded that the renovations took place solely for the benefit of the School. It noted that Mosaica, as the grievant, had the burden of proof, but that it failed to produce any evidence that there was an alternate facility to house the School. The

---

8. This section reads:

> **Section 10.17   Relation to Management Agreement.**   So long as [EFA] and Mosaica Education, Inc. (MEI) maintain common ownership, [School's] claims against MEI (to the extent they are valid) may be offset against by [School] against [EFA] and MEI's claims against [School] (so long as they are valid) may be offset by [EFA] against [School].   [EFA] has represented that [EFA] and MEI maintain common ownership.   Should [EFA] sell the premises to a company not enjoying common ownership with [EFA] or MEI, no such offset may occur.   Otherwise, this offset provision remains in full force and effect.   Two entities are defined as having "common ownership" if 5% of either entity is owned by any individual(s) or entity(ies) owning (either directly or indirectly through other entities) any interest in the other entity.   Should [EFA] sell the premises, [EFA] maintains the duty to place the buyer on notice of the obligation to provide evidence of ownership to [School] satisfactory to [School] such as will insure full disclosure for purposes of enforcing this provision.
>
> (Lease Agreement between EFA, Landlord and School, Tenant, R.R. at 50a–51a.)

Board seemed to place much emphasis on Eidelman's testimony that Mosaica "took a huge risk" that it "could have been stuck with the building without any tenants" if the charter was not approved. The Board also seems to infer from this testimony that, if the charter was approved, the School would definitely use the Property. (*See* Board Final Decision and Order at 16–17.)

Accordingly, the Board found the Wage Act's provisions to be applicable to the project.

## II.

■ Initially we must address whether Mosaica was a contractor under the CSL which requires "contractors of charter schools" to comply with the Wage Act's provisions for construction projects and construction-related work. We begin by first identifying the relevant statutory language and then addressing the parties' arguments.

## A.

■ The CSL makes the terms of the Wage Act applicable to "Boards of trustees and contractors" although, in doing so, neither it, nor the Wage Act, defines the term contractor.[9] The Wage Act provides that

"[i]t shall be the duty of every public body [10] which proposes the making of a contract for any project of public work to determine from the [Secretary of Labor and Industry] the prevailing minimum wage [11] rates which shall be paid by the contractor to the workmen upon such project." Section 4 of the Wage Act, 43 P.S. § 165–4 (footnotes added). The Wage Act defines "public work" to

> mean[] construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and *paid for in whole or in part out of the funds of a public body* where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000), but shall not include work performed under a rehabilitation or manpower training program.

43 P.S. § 165–2(5) (emphasis added).

Although it has since been changed by the legislature, at all times during the construction project at issue in this case, the CSL specifically precluded the use of public funds to finance construction projects. The parties agree that no public funds were used to finance the renovations at issue in this case. Because there were no public funds involved, this project was not a public work, and the Wage Act, by its own terms, would not apply to this

9. This section provides that:
   Charter schools shall be required to comply with the following provisions:
   * * * *
   (10) Boards of trustees and **contractors** of charter schools shall be subject to the following statutory requirements governing construction projects and construction-related work:
   (i) The following provisions of this act:
   * * * *
   (iii) The act of August 15, 1961 (P.L. 987, No. 442), known as the "Pennsylvania Prevailing Wage Act."
   24 P.S. § 17–1715–A (emphasis added).

10. The Wage Act defines "public body" to mean, among other things, any of the Commonwealth's political subdivisions. Section 2 of the Wage Act, 43 P.S. § 165–2(4).

11. Section 5 of the Wage Act provides that "[n]ot less than the prevailing minimum wages as determined hereunder shall be paid to all workmen employed on public work." 43 P.S. § 165–5; 34 Pa.Code § 9.106(a). Pursuant to Section 7 of the Act, the Secretary of Labor and Industry determines the general prevailing minimum wage rate for each craft or classification in the locality in which the public work is to be performed. 43 P.S. § 165–7; 34 Pa.Code § 9.106(a).

situation. 43 P.S. § 165–2(5) (defining public work as "construction ... paid for ... out of the *funds of a public body* ...."). As discussed more extensively in our prior decision in *Mosaica I*, it is only through the CSL, and its mandate that the Wage Act apply to the trustees and contractors of charter schools, that the Wage Act could apply here where no public funds were used for construction.

### B.

Mosaica argues that there is no evidence that the project was undertaken by the Trustees or by a contractor of the School as required by the CSL. Mosaica contends that: the record indicates that the project was undertaken by Mosaica, independent of the School; Mosaica's contractor for the project was Ritter Brothers; and Ritter Brothers had no contractual relationship with the School, but only entered the construction agreement with Mosaica. Mosaica argues that it, alone, financed the renovations with its own private funds and that, accordingly, the Wage Act should not apply.

The Department[12] argues that a "contractor" is not just one doing construction work, but, under the plain meaning of the term, is one who contracts with another. According to the Department, both the lease agreement and the management agreement were contracts that Mosaica and EFA had entered with the School, so Mosaica was a contractor of the School. As such, the Department contends that the construction work that Mosaica performed on the Property, by way of its construction contract with Ritter Brothers, should be subject to the Wage Act as the work of a contractor.

### C.

At the time of our *Mosaica I* opinion, given the, then applicable, prohibition on the use of public funds, it seemed that the General Assembly intended the CSL to apply when a charter school used its own funds to pay for the construction work. In this case, however, no School funds were used to renovate the Property. This seems to remove the construction project from the ambit of being a public work.

■ Additionally, we do not find that Mosaica was a contractor for purposes of the Wage Act.[13] Alternatively, even if we

---

12. The Pennsylvania State Building and Construction Trades Council, AFL–CIO, filed a brief incorporating the Department's brief.

13. While the term contractor is not defined in either the Wage Act or the CSL, reading the two *in pari materia*, the term "contractor" seems limited to the actual entity doing the construction work and being paid by the School with the School's own funds to do so. When a term is not defined by the statute, it is interpreted as having its meaning in "common ... usage." 1 Pa.C.S. § 1903(a). The dictionary defines "contractor" as "1. A party to a contract. 2. More specif[ically], one who contracts to do work or provide supplies for another." *Black's Law Dictionary* 327 (7th ed.1999). As noted earlier, the CSL provides that contractors on public works are subject to the Wage Act. The Wage Act defines "public work" as *"construction ... work ... done*

*under contract* and paid for ... out of the funds of a public body...." 43 P.S. § 165–2(5) (emphasis added). The inference that can be drawn from this language is that the contractor, as that term is used in the CSL, is the one doing the construction work under contract. The overall policy of the Wage Act—to provide construction workers on public projects with a fair wage—also supports this conclusion. Additionally, other provisions of the Wage Act that require the contractor to explicitly account for the time and labor of the construction workers, suggest the contractor is the one with direct oversight responsibility of the actual construction workers. *See, e.g.,* Section 10(a) of the Wage Act, 43 P.S. § 165–10(a) (requiring contractor and subcontractor to file statements in writing that certify the names and wages owed to "all workmen ... on account of public work"). Applied to the present case, Ritter Brothers,

accept the Department's argument that Mosaica was a contractor, the contractual relationship between Mosaica and the School did not arise until the two entered the management agreement, which was *after* Mosaica entered the construction contract. Thus, it cannot be said that Mosaica entered the agreement on behalf of the School because, at the time of the agreement, it had no *formal*[14] relationship with the School.[15]

### III.

Next we address whether Mosaica, under the facts of this case, must nonetheless comply with the Wage Act. The arguments raised under this issue stem from our direction to the Board, on remand, to address the issue of piercing the corporate veil. The Department is essentially arguing that, under *Lycoming County Nursing Home Association v. Department of Labor and Industry, Prevailing Wage Appeal Board*, 156 Pa.Cmwlth. 280, 627 A.2d 238 (1993), "[c]onstruction projects undertaken by instrumentalities or alter egos of an entity covered by the Act also trigger coverage." (Department's Br. at 13.)

### A.

■ In general, piercing the corporate veil is a means of assessing liability for the acts of a corporation against an equity holder in a corporation. *Hanrahan v. Audubon Builders, Inc.*, 418 Pa.Super. 497, 614 A.2d 748, 752 (1992). There is a strong presumption in Pennsylvania against piercing the corporate veil and "the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." *Lumax Industries, Inc. v. Aultman*, 543 Pa. 38, 42, 669 A.2d 893, 895 (1995). The corporate form will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime. *First Realvest, Inc. v. Avery Builders, Inc.*, 410 Pa.Super. 572, 600 A.2d 601, 604 (1991). In this case, the parties were asked to address this principle based on arguments that Mosaica and EFA were instrumentalities of the School, such that the Wage Act provisions should be imposed on the work that Mosaica had performed on the Property, which was owned by EFA.

### B.

Mosaica argues that neither the facts nor the law supports the conclusion that the three entities (Mosaica, EFA, and the School) were so interwoven as to be alter egos. Mosaica argues that the School is a separate corporation paying market rate in an arms' length valid lease. Additionally, Mosaica contends that the Board's decision conflicts with this Court's decision in *Brackbill*, in which the Court held that Mosaica and the School were independent entities. Mosaica also argues that the Board erred in relying on *Lycoming County*.

and not Mosaica, is the body that specifically employed the workers engaged in the construction work. Mosaica, and not the Trustees, paid for the work the contract and its employees engaged in. Accordingly, as Mosaica is not a contractor as that term is used within the Wage Act, it is not subject to the Wage Act requirements.

14. As discussed further in the second issue, the Board in its decision, and the Department in this appeal, rely heavily in their findings and arguments, respectively, on the informal relationship between Mosaica and the School that predated the formal, contractual relationship.

15. Additionally, the management contract between Mosaica and the School was for management of the day-to-day operations of the School, and did not address who controlled modifications to the structure of the facilities.

The Department argues that it is irrelevant that the management contract was entered after the construction work had begun. Drawing from prevailing wage law arising under the federal Davis–Bacon Act, 40 U.S.C. § 3142, the Department argues that we should consider: whether the project would have been undertaken regardless of the lease; the extent to which the project is being used for public and private uses; and, whether the lease is an attempt to evade the prevailing wage requirements. It is the Department's contention that each of these factors weigh in favor of finding that this is a public work. Additionally, the Department argues that a legal entity, such as Mosaica, can be considered an instrumentality or alter ego of a public body, thereby subjecting any work contracted for by the instrumentality, for the benefit of the public body, to be subject to the Wage Act. *Lycoming County*, 627 A.2d at 243.

### C.

■ We conclude that Mosaica was not subject to the Wage Act under a piercing the corporate veil theory because it was not an instrumentality of the School. The Department is correct that in *Lycoming County*, we held that in applying the Wage Act provisions, "the corporate existence can be disregarded without a specific showing of fraud, ... whenever it is necessary to avoid injustice or when public policy requires." *Lycoming County*, 627 A.2d at 244 (citation and quotations omitted). However, *Lycoming County* is factually distinguishable from the present case largely because, unlike the present case, *Lycoming County* involved a shell corporation set up by a public body, so that the corporation's expenditures were, effectively, the expenditure of public funds from the public body. The present case involves the expenditure of funds from a distinct corporation (*see Brackbill*, 777

A.2d at 137) that was not established by a public body.

In *Lycoming County*, the county had established a new, private, non-profit corporation, referred to as the "Association," to run a facility that serves indigent patients. The incorporators of the Association were the county's three commissioners. The County loaned the Association $500,000.00 for start-up costs. The Association applied for a certificate of need from the Department of Health, which was subsequently issued to the County. Ten months after incorporation, the Association's bylaws were amended to provide for nine directors. The Association's directors voted to eliminate the positions set aside for the commissioners, and the commissioners resigned. The Association solicited bids to construct a new facility, and awarded the contract to the lowest bidder. A month later, the Association entered into a lease agreement with the County, under which the County authorized issuance of two bonds totaling $11,590,000.00, which was loaned to the Association. The county remained liable on the bonds if the Association defaulted. Additionally, the County leased the property on which the facility would sit for twenty-five years, at the conclusion of which the County would own all improvements on the property. The Association agreed to construct the facility and run the facility's day-to-day operations.

The contractor and Association disputed whether the Wage Act's provisions applied, with the Association arguing that it was not a public body. We disagreed, reasoning that:

> The County here clearly was not *just* involved with the financing of the project. As No. 28–1974, however, notes, funds for a project, when obtained through the issuance of revenue bonds ... for which it pledges its credit and

must repay in the event of default by the private entity, are public funds when a public purpose is furthered. As the Board found, the County loaned money to the Association and remained liable on the bond if the Association defaulted. Moreover, the County leased the property to the Association. The County's Commissioners undertook the feasibility study, appointed themselves as Directors, and, as Directors, influenced the Association when it contracted for the building and the operating of the facility. In addition, construction began before the lease agreement for the land was signed and before the bonds were issued, indicating that the Commissioners knew that the outcome of the negotiations between them and the Association's Directors would be favorable.

Although the Association actually contracted for the construction of the project and undertook the responsibility of the day-to-day activities of the nursing home, the Board found that the funds were public funds and were intended to further a public purpose. Moreover, the Act applies even when a "public body ... *proposes* the making of a contract for any project of public work." Section 4 of the Act. Therefore, we hold that because the Association used public

funds for a public purpose that was proposed by a "public body," it stands in the shoes of the County, is a "public body" doing "public work" and is covered by the Act.

*Lycoming County*, 627 A.2d at 243 (emphasis added). In contrast, in the present case, there were no public funds expended and there was no public project. Additionally, unlike in *Lycoming County*, Mosaica is not a shell corporation set up by a public body, but is a separate entity, *see Brackbill*, 777 A.2d at 137 that, since the beginning of this process, has been dealing with the School as such.

Nothing from the evidence presented at the hearing on remand establishes Mosaica and EFA are alter egos, or instrumentalities of the School. While it seems that Mosaica and EFA have, what could fairly be described as a symbiotic relationship, there is no evidence establishing that either has such a relationship with the School. This issue has been addressed in *Brackbill*, and some preclusive effect must be given to that case. The CSL prohibits a for-profit corporation from receiving a charter. If Mosaica and the School were inextricably linked, this Court would have denied the charter in *Brackbill*. It did not do so.[16] Much evidence came forth in this

---

**16.** In *Brackbill*, this Court rejected the District's argument that control by a for-profit corporation would violate Section 1720-A of the CSL, 24 P.S. § 17–1720-A, which limits the grant of charters to a school organized as a public, nonprofit corporation. Relying on this Court's decision in *West Chester Area School District v. Collegium Charter School*, 760 A.2d 452 (Pa.Cmwlth.2000), this Court concluded that a charter school board's contracting with a private, for-profit corporation to manage the school did not run afoul of Section 1720-A's requirements. In *Brackbill*, the charter school at issue was the one also involved in this appeal, and *West Chester* also involved a charter school that was managed by Mosaica. We reasoned in *Brackbill* that:

The CSL provides that a charter may be *granted* only for a school organized as a public, non-profit corporation; charters may not be granted to any for-profit entity. Yet, there is no question that the CSL permits a charter school to be *established* by "any corporation," even if that corporation is a for-profit entity. Therefore, as conceded by Petitioners, Mosaica was legally eligible to complete and submit the charter Application for Collegium. Clearly, however, the legislature did not want to entrust the management and operation of the charter school itself to entities seeking to make money from the school's management and operation; rather, that power is granted to the charter school's board of trustees who, as public officials, have a single purpose to

case about Mosaica's efforts to assist the School in preparing its application—similar evidence was presented in the *Brackbill* case. Here, there is nothing new to lead to a different conclusion than we reached in *Brackbill.*

Additionally, as to their dealings with each other, since the *Brackbill* decision, nothing in the evidence presented establishes that Mosaica and EFA acted on the School's behalf in a manner legally binding on the School. While Mosaica and EFA may have been helping the School obtain the charter and find an appropriate location, respectively, there is no indication they did so under contractual obligation. Additionally, the evidence linking the School with Mosaica and, in particular, the internet web evidence, is all from a time after the management agreement was executed. There is no evidence that, had the Trustees decided to use a different property for the School, or not to use Mosaica to manage the School, either EFA or Mosaica would have had any cause of action against the Trustees or the School.

Moreover, the federal authority relied on by the Department does not, under the facts of this case, support its position that, regardless of who paid for the renovation work to the Property, it should be considered a public work subject to Wage Act protection because the Property was leased to the School. The Department contends that, under the federal Davis–Bacon Act, "[a] lease of a facility to a

federal government agency is considered a contract for construction of a public building, requiring prevailing wages ... *when the government plays a large role in determining space and performance goals."* (Department's Br. at 14 (emphasis added).) In this case, there is no evidence that the School had any role in determining space and performance goals for the project and, in fact, the only testimony that spoke to that issue indicated that it did not.

Accordingly, we do not find that the EFA or Mosaica were in any way alter egos or instrumentalities of the School or the Trustees, and find the doctrine of piercing the corporate veil inapplicable to this case.

### IV.

For these reasons, we find the Wage Act provisions were not applicable to work performed on the Property. Accordingly, the order of the Board is reversed.

### *ORDER*

**NOW,** May 8, 2007, the order of the Prevailing Wage Appeals Board in the above-captioned matter is hereby **REVERSED.**

promote the interests of pupils.... However, the CSL does not prohibit charter schools from contracting out certain management and administrative responsibilities to a for-profit corporation. Rather, the CSL grants charter schools all powers necessary or desirable for carrying out its charter, including, but not limited to, the power to acquire real property by purchase or lease and the power to make contracts or leases for the procurement of services, equipment and supplies. Thus, the [Char-

ter School Appeal Board] properly concluded,
nothing in the [CSL] prohibits the involvement of for-profit entities in the establishment and operation of a charter school, so long as the school itself is not for-profit, the charter school's trustees have real and substantial authority and responsibility for the educational decisions, and the teachers are employees of the charter school itself.
*Brackbill,* 777 A.2d at 136 (quoting *West Chester,* 760 A.2d at 468).