500 JAMES HANCE COURT and
Knauer and Gorman Construc-
tion Co., Inc., Petitioners

v.

PENNSYLVANIA PREVAILING
WAGE APPEALS BOARD,
Respondent.

Commonwealth Court of Pennsylvania.

Argued June 8, 2009.
Decided Aug. 31, 2009.
Reargument Denied Nov. 10, 2009.
Publication Ordered Nov. 18, 2009.

Joseph T. Doyle, Wayne, for petitioners.

James A. Holzman, Deputy Chief Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and KELLEY, Senior Judge.

OPINION BY Judge McGINLEY.

500 James Hance Court, LP (JHC) and Knauer and Gorman Construction Co. (Knauer and Gorman) (collectively, Appellants) petition for review from a decision of the Prevailing Wage Appeals Board's (Board) denial of Appellants' grievance that the construction of the "building shell" was not "public work" that required the application of the Pennsylvania Prevailing Wage (Wage Act).[1]

On December 7, 2006, Appellants filed a notice of grievance with the Board and alleged:

I. *Identity And Interest Of The Grievants*

1. 500 James Hance Court, L.P. is a Pennsylvania limited partnership, the general partner of which is 500 JHC, LLC, a Pennsylvania limited liability company, the only limited partners are James J. Gorman and Christopher J. Knauer. The sole members of 500 JHC, LLC are James J. Gorman and Christopher J. Knauer.

---

1. Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. § 165–1–165–17.

794

2. Knauer and Gorman Construction Co., Inc. ("Knauer and Gorman") is a Pennsylvania for-profit corporation, the sole shareholders of which are James J. Gorman and Christopher J. Knauer.

3. 500 James Hance Court, L.P. is the equitable owner of real property located at 500 James Hance Court ... also known as Lot 11 of Oaklands Corporate Center (the "Property").

4. *In mid 2006, 500 James Hance Court, L.P. entered into a construction management contract with Knauer and Gorman, to construct a building on the Property.* (emphasis added).

5. 500 James Hance Court, L.P. and Knauer and Gorman are sometimes hereinafter refereed [sic] to collectively as the "Grievants".

6. *The Grievants [500 James Hance Court, L.P., Knauer and Gorman] are seeking a determination from the Prevailing Wage Appeals Board that the Prevailing Wage Act ... is not applicable to the Project for the reasons hereinafter stated.* (emphasis added).

## II. *Identity Of Project And The Contracting Public Body*

7. The project consists of the construction of an approximately 68,000 square foot building shell on the Property.

8. James J. Gorman and Christopher J. Knauer are real estate developers who have developed the Oaklands Corporate Center under various entities for the last 15 years, one of which is 500 James Hance Court, L.P.

. . . .

11. Oaklands Corporate Center is a mix of offices, light manufacturing, medical offices, research facilities, wholesale sales and distribution facilities, vocational and other educational institutions.

12. *Collegium Foundation, a Pennsylvania nonprofit corporation ("Collegium") that acts as a support organization for Collegium Charter School, also a Pennsylvania nonprofit corporation, is the owner of a building in Oaklands Corporate Center located at 535 James Hance Court which has been occupied by Collegium Charter School for the last 2 to 3 years as the school's class and administrative office building.* The building was purchased from the Chester County Intermediate Unit.

13. *In mid 2006 Collegium became aware that 500 James Hance Court, L.P. planned to construct a building on the Property for single or multiple tenant use.* (emphasis added).

14. A representative of Collegium contacted James J. Gorman to discuss leasing the building. *Eventually, the provisions of a lease were negotiated, under which 500 James Hance Court, L.P. would lease to Collegium a building to be built by Knauer and Gorman and owned by 500 James Hance Court, L.P., with Collegium responsible for the entire fit out of the building shell at its sole cost and by its contractor or contractors.* (emphasis added).

15. *Collegium in turn will sublease the building to Collegium Charter School.* (emphasis added).

## III. *A Brief Statement Of The Issue Or Dispute Giving Rise To The Grievance*

16. Neither Collegium nor Collegium Charter School own directly or indirectly an interest in 5000[sic] James Hance Court, L.P., 500 JHC, LLC, Knauer and Gorman.

17. *No public body is a party to the contract to build the Project, nor is public money being used to construct the building shell.* (emphasis added).

18. *Funding for construction of the building shell will be provided by Fulton Bank, 500 James Hance Court, L.P. will be solely liable for repayment of the construction loan.* (emphasis added).

19. *Neither 500 James Hance Court, L.P. nor Knauer and Gorman Construction Co., is an alter-ego or instrumentality of Collegium nor Collegium Charter School.* (emphasis added).

20. *No funds from Collegium nor Collegium Charter School are being paid to 500 James Hance Court, L.P. nor to Knauer and Gorman to construct the building shell.* (emphasis added).

19. [sic] *The Construction of the building shell is not a public work project.* (emphasis added).

21. *Collegium and Collegium Charter School are not parties to the construction contract between 500 James Hance Court, L.P. and Knauer and Gorman, nor are they obligated to repay nor guaranty [sic] the construction loan.* (emphasis added).

## IV. *Brief Statement Of The Agency's Position*

22. *The Bureau of Labor Law Compliance (the "Bureau") determined that the Prevailing Wage Act does apply to the project* .... (emphasis added).

Notice of Grievance, December 7, 2006, Paragraphs 1–8 and 11–22 at 1–4; Reproduced Record (R.R.) at 8a–11a.

After a number continuances, the Board allowed the parties to file supplemental briefs no later than April 15 and May 1 respectively.[2]

The Board made the following findings of fact [3]:

1. *On or about September 25, 2006, JHC contracted with KGC to construct a 68,000 square foot building on Lot 11 of Oaklands Corporate Park or 500 James Hance Court* .... (emphasis added).

2. On or about October 2, 2006, KGC contracted with Pancoast and Clifford, Inc. (PCI) to construct the building.

3. *On March 1, 2007, the September 25 contract was amended to provide for the separation of the construction into the building "shell" and the building "fit out."* (emphasis added).

4. On or about March 1, 2007, JHC took title to lot 11 ....

5. *On or about March 1, 2007, JHC and the Collegium Foundation entered into a lease for the building.* (emphasis added).

6. *On or about March 1, 2007, the Collegium Foundation entered into a "First Supplemental Agreement of Lease" with Collegium Charter School for this building.* (emphasis added).

7. On or about September 11, 2007, the Collegium Charter School Foundation and PCI entered into a contract for "fit out" of the building for the Collegium Charter School.

8. Collegium Charter School is a public nonprofit corporation authorized to operate a charter school within the West Chester Area School District under the Charter School Law. It has a board of trustees and also operates another charter school at 535 James Hance Court, Exton.

---

2. Petitioners and the Bureau requested a continuance in order to address this Court's decision in *Mosaica Education, Inc. v. Pennsylvania Prevailing Wage Appeals Board (Mosaica II)*, 925 A.2d 176 (Pa.Cmwlth.2007).

3. The Board noted that "[o]ur findings of fact are derived from the parties' stipulation with only minor stylistic changes...." The Board's Final Decision and Order, June 30, 2008, at 3 n.1.

9. The Collegium Foundation is a Pennsylvania nonprofit foundation organized to operate exclusively for the support and benefit of the Collegium Charter School.

10. *Landlord's [sic] construction of the building shell includes site work; chain link fence; permanent seeding; cast-in-place concrete; unit masonry; structural steel; miscellaneous metals; carpentry; roofing and metal panel systems; sealants; and caulking; doors; frames and hardware; windows, glass and glazing; gypsum wallboard and ceiling systems; hydraulic elevator; fire suppression sprinklers; plumbing; HVAC; and electric.* (emphasis added).

11. The total cost of construction of the shell is at least $5,117,120.

12. The cost to complete the building "fit out" is at least $1,590,780. *This was financed, in part, with the remaining portion of a $15.5 million Chester County Industrial Development Authority Revenue Board and Chester County Industrial Development Authority Revenue Bond and Chester County Industrial Federally Taxable Revenue Bonds in the amount of $490,000 and a loan from Fulton Bank to Collegium Foundation.* (emphasis added).

13. *James J. Gorman and Christopher J. Knauer are partners in JHC. James Gorman is also Shareholder, Director and president of KGC. Christopher J. Knauer is also Director and Secretary of KGC.* (emphasis added).

14. *Construction for the 'fit out' includes electrical, installation of elevator, mechanical, plumbing, heating, walls, doors, fixtures, painting and equipment. This work commenced at or about the date the building shell was completed.* (emphasis added).

15. On June 6, 11, 18, 2007, Collegium Foundation advertised for bids for the electrical and mechanical fit out of the building.

16. *Pennsylvania prevailing wages were requested for construction of the "fit out."* The Bureau issued rates for the project on August 25, 2006 . . . .

17. Grievants received notice of the Bureau's opinion and the Board's orders and filed briefs in this matter.

Board's Decision, June 30, 2008, Findings of Fact (F.F.) Nos. 1–17 at 3–5.

The Board concluded:

1. By virtue of section 2(5) of the Act, 43 P.S. § 165–2(5), and section 1715 of the CSL [Charter School Law], 24 P.S. § 17–1715–A(10), *construction work done under contract for or by boards of trustees of charter schools (or their instrumentality or alter ego) is subject to the Act,* if done under contract, paid for in whole or in part by the funds of a charter school (or its instrumentality or alter ego), and the estimated total cost of the project exceeds $25,000. (emphasis added).

2. The performance of construction work otherwise subject to the Act under the terms of a lease with a public body, other covered entity or their instrumentality or alter ego is not automatically exempt from the Act. *Rather, the lease agreement must be evaluated under the following factors to determine if the lease is really a contract for public work, or just a contract to serve the use of the private premises on a temporary basis . . . .* (emphasis added).

3. *The building shell portion of the subject project is a "public work,"* by virtue of section 2(5) of the Act, 43 P.S. § 165–2(5), and section 1715–A(10) of the CSL, 24 P.S. § 17–1715–A(10), and as a result, all workmen employed on that portion of the project shall be paid not less than the predetermined mini-

mum wage rates as determined by the Secretary of Labor and Industry, in accordance with section 5 of the Act, 43 P.S. § 165–2(5). (emphasis added).

4. Grievants have not met their burden of proof in this proceeding, as required by 34 Pa.Code § 213.8(j).[4]

Board's Decision, Conclusions of Law (C.L.) Nos. 1–4 at 21–22.

## I. Whether the Wage Act Applied To The Entire Construction Contract Where The Construction Of The "Building Shell" Was Paid For With Private Funds And The "Fit Out" Was Paid For With Public Funds?

■ On appeal[5], Appellants contend that there are no provisions in the Wage Act that mandate the application of the prevailing wage to a construction project that is divided into separate contracts. Specifically, Appellants assert that the funding for construction "fit out" was financed with public funds and subject to the provisions of the Wage Act. On the other hand Appellants secured a private loan from the Fulton Bank to construct the "building shell," and this contract was not financed with public funds and not subject to the provisions of the Wage Act.

### A. Pertinent Sections Of The Wage Act.

Section 2 of the Wage Act, 43 P.S. § 165–2, defines the following terms:

. . . .

(4) **"Public body"** means the Commonwealth of Pennsylvania, any of its political subdivisions, any authority created by the General Assembly of the Com-

monwealth of Pennsylvania and any instrumentality or agency of the Commonwealth of Pennsylvania.

(5) **"Public work"** *means construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and paid for in whole or in part out of the funds of a public body where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000),* but shall not include work performed under a rehabilitation or manpower training program. (emphasis added).

Section 4 of the Wage Act, 43 P.S. § 165–4, provides that "[i]t shall be the duty of every public body which proposes the making of a contract for any project of public work to determine from the secretary the prevailing minimum wage rates which shall be paid by the contractor to the workmen upon such project. . . ."

Section 5 of the Wage Act, 43 P.S. § 165–5, provides that "*[n]ot less than the prevailing minimum wages as determined hereunder shall be paid to all workmen employed on public work.*" (emphasis added).

Last, Section 2.2(e) of the Wage Act, 43 P.S. § 165–2.2(e), provides that "[t]he Appeals Board shall have the power and duty to . . . [h]ear and determine any grievance or appeal arising out of the administration of this act" and to "[p]romulgate rules and regulations necessary to carry out the duties placed upon the board by this act: [p]rovided, however, [t]hat any such rules

---

4. 34 Pa.Code § 213.8(j) provides that "[t]he General rules govern evidentiary hearings . . . [t]he burden shall be on the grievant."

5. This Court's review is limited to a determination of whether constitutional rights have been violated, whether the adjudication was in accordance with the law, and whether the

Board's findings are supported by substantial evidence. *Lycoming County Nursing Home Association, Inc. v. Department of Labor and Industry, Prevailing Wage Appeal Board,* 156 Pa.Cmwlth. 280, 627 A.2d 238, 241 n. 4 (1993).

and regulations shall provide for notice of filing of grievances and appeals, public hearings, rights of representation and all procedures required by due process of law."

### B. The Board's Conclusions And Analysis As To Why The Wage Act Was Applicable.

The Board concluded that the Wage Act applied because (1) the construction of the "building shell" was "public work", (2) the lease between Appellants and the Collegium Foundation was entered into prior to the construction contract which divided the construction of the "building shell" and the "fit out" into two separate construction contracts, and (3) the lease payments funded the construction of the "building shell." [6] This Court shall address each of the Board's conclusions seriatim.

### II. Whether The Construction Of The "Building Shell" Was "Public Work"?

In *Pennsylvania National Mutual Casualty Insurance Co. v. Department of Labor and Industry, Prevailing Wage Division*, 552 Pa. 385, 715 A.2d 1068 (1998), our Pennsylvania Supreme Court reviewed the pertinent sections of the Wage Act and its application:

> Turning to the public policies advanced by the [Wage] Act, the primary underlying policy of the Act is to protect workmen employed on public work projects from substandard pay by ensuring that they receive prevailing minimum wage....
>
> ....
>
> *A review of the [Wage] Act's requirements ... of 'public works' .... [re-*

quires that] *only workmen who labor on 'public work' must be paid the minimum prevailing wage....*

....

Again, to constitute 'public work' four elements must be satisfied:

(1) *there must be certain work;*

(2) *such work must be under contract;*

(3) *such work must be paid for in whole or in part with public funds;* and

(4) *the estimated cost of the total project must be in excess of $25,000.*

Under the facts of this case, the lower tribunals found that the $109,000.00 asbestos removal work met this definition. The asbestos removal was the kind of work covered by the [Wage] Act, i.e. demolition work, *it was under contract, and as determined by the lower tribunals, was paid for in whole or in part out of the funds of a public body.* The $25,000 threshold was clearly met. *The lower tribunals then found that because the asbestos removal constituted public work, the entire PNI [Pennsylvania National Mutual Insurance Co.] building project, i.e., the remaining work, constituted public work for purposes of the [Wage] Act.*

*While the remaining work is construction work, and is done under contract, the construction work is not paid for in whole or in part from the funds of a public body. Thus, failing the third element necessary to constitute 'public work,' the remaining construction work does not meet the definition of 'public work,' and, thus, is not covered by the [Wage] Act.*

The Board and Commonwealth Court [7] found that the asbestos removal work

---

6. This Court has foregone the sequence of the Board's C.L.s.

7. In *Pennsylvania National Mutual Casualty Insurance Co.,* our Pennsylvania Supreme Court held that this Court erroneously concluded that "since asbestos removal was cov-

constituted public work which triggered coverage of the [Wage] Act for the entire PNI building project. Specifically, the Board found, and the Unions here argue, that the [Wage] Act speaks to the 'total project,' and not individual contracts or phases, and establishes coverage where *any* work is public work. *Thus, the Board looked at the whole project as a comprehensive undertaking.*

We do not agree with the Board's interpretation of the definition of 'public work.' Assuming, arguendo, that the 'total project' is the $30 million PNI building project, the term 'total project,' is referred to in the definition of 'public work' only in the context of establishing a monetary threshold which excludes from coverage of the [Wage] Act, projects costing less than $25,000. *We do not interpret this prong to confer public work status to work which otherwise fails to satisfy the other three elements of the definition of 'public work.' Rather, all elements of the definition must be satisfied for work to constitute 'public work.'*

*Nothing in Section 5 of the [Wage] Act mandates that an entire construction project be covered by the Act.* On the contrary Section 5 is a limited requirement that workmen be paid prevailing wage only on 'public work.' *The legislature could have crafted the definition of 'public work' to include work that was not paid for in whole or in part with funds of a public body, but instead it chose to limit prevailing wage to be paid only on that work which satisfies the four element definition of 'public work.'* (emphasis added and in original).

ered by the [Wage] Act, then the total project was likewise covered under the [Wage] Act."

*Pennsylvania National Mutual Casualty Insurance Co.,* 552 Pa. at 394–98, 715 A.2d at 1072–74.

■ Critically, in the present matter, the construction of the "building shell" was not "paid for in whole or in part from the funds of a public body." See *Pennsylvania National Mutual Casualty Insurance Co.,* 552 Pa. at 386, 715 A.2d at 1074. On March 1, 2007, JHC executed a promissory note with Fulton Bank:

> FOR VALUE RECEIVED, 500 James Hance Court, L.P. ... ("Maker") promises to pay to the order of Fulton Bank ... the principle sum of Ten Million Six Hundred Eighty Three Thousand Seven Hundred Dollars ($10,683,700) (*or so much thereof as has been advanced by Payee to or for the benefit of Maker pursuant to a certain construction loan agreement*) dated this date by and between Maker and Payee (the "Construction Loan Agreement") lawful money of the United States of America, together with interest thereon from the date hereof at the rates and payable as hereinafter provided .... (emphasis added).
>
> 1. *Interest Rate.*
>
> (a) The principle sum outstanding hereunder shall bear interest at a fixed annual rate at all times equal to seven and one quarter percent (7.25%).
>
> ....
>
> 2. *Payments of Principal and Interest.*
>
> ....
>
> (b)....
>
> (i) Maker shall pay monthly installments of principal and interest based upon (I) the principal amount of the Loan outstanding on the first day of the Term Loan Period, (II) the interest rate in effect under Section 1(a) hereof, and

*Id.* at 397 n. 9, 715 A.2d at 1074 n. 9.

(III) a twenty-five (25) year amortization schedule.

Promissory Note, March 1, 2007, Paragraphs 1 and 2 at 1; R.R. at 166a.

The promissory note was secured by a first mortgage on Appellants' Property. Appellants are solely responsible for the repayment of the loan and there is nothing to support the Board's suggestion that the promissory note was secured by the Collegium Foundation's rent payments.

To the contrary, the construction of the "fit out" was clearly "public work" which triggered prevailing wages under the Wage Act. The clear and uncontroverted distinction is that the construction of the "building shell" was not "public work" because the project was privately financed and secured by Appellants.

**III. Whether Appellants Attempted To Circumvent The Wage Act When It Divided The Construction Of The Building Into Separate Contracts For The Construction Of The "Building Shell" And The "Fit Out"?**

The Board determined that it was undisputed that the Wage Act applied to the original construction contract between Appellants and the Collegium Foundation where Appellants intended to construct a building for the Charter School which included both the "building shell" and the "fit out." The Board then concluded that the Wage Act applied because Appellants intended to circumvent the application of the prevailing wage when it contracted with Pancoast & Clifford, the original construction contractor, and divided the construction of the "building shell" and the "fit out" into two separate construction contracts. Essentially, the Board determined that "[e]valuated separately, the shell and fit out construction require Pennsylvania prevailing wages ... given that

this construction is comprised of one 'total project' for one building comprised of the same contractors." *See* Brief for Intervenor Respondent Department of Labor and Industry, Bureau of Labor Law Compliance at 23.

In *Mosaica II:*

The [Ronald H. Brown Charter School] School contracted with the Delaware for-profit corporation Mosaica Education, Inc. (Mosaica) to provide management services for the School. The School entered into a lease of the building with EFA Company, LLC (EFA), a Michigan-based limited liability company of which Mosaica is the sole shareholder. EFA had previously acquired the building used by the School, and Mosaica made renovations to it in preparation for its use as a school. The Department of Labor and Industry, Bureau of Labor Law Compliance (Department) determined that the renovations were made for the benefit of the School and were subject to the Wage Act. Mosaica grieved that decision.

. . . .

... [T]he Board found the Wage Act's provisions to be applicable to the project.

. . . .

Mosaica argues that there is no evidence that the project was undertaken by the Trustees or by a contractor of the School as required by the CSL. *Mosaica contends that: the record indicates that the project was undertaken by Mosaica, independent of the School; Mosaica's contractor for the project was Ritter Brothers; and Ritter Brothers had no contractual relationship with the School, but only entered into the construction agreement with Mosaica. Mosaica argues that it alone financed the renovations with its own private*

*funds and that, accordingly, the Wage Act should not apply.*

The Department argues ... both the lease agreement and the management agreement were contracts that Mosaica and EFA had entered with the School, so Mosaica was a contractor of the School. As such, the Department contends that the construction work that Mosaica performed on the Property, by way of its construction contract with Ritter Brothers, should be subject to the Wage Act as the work of a contractor. *... In this case, however, no School funds were used to renovate the Property. This seems to remove the construction project from the ambit of being a public work.*

Additionally, we do not find that Mosaica was a contractor for purposes of the Wage Act. *Alternatively, even if we accept the Department's argument that Mosaica was a contractor, the constructional relationship between Mosaica and the School did not arise until the two entered the management agreement, which was after Mosaica entered the construction contract. Thus, it cannot be said that Mosaica entered the agreement on behalf of the School, because at the time of the agreement, it had no formal relationship with the School.* (emphasis added and in original).

*Mosaica II,* 925 A.2d at 178, and 182–84.

█ Here, like in *Mosaica II,* the facts are similar: first, no public funds were used in either *Mosaica II* [8] or here to construct the "building shell"; second, Mosaica was a for profit corporation and not a "contractor" pursuant to the Wage Act. Likewise, JHC is a for profit corporation and not a "contractor" under the Wage

Act; third, in *Mosaica II,* Mosaica was the sole shareholder of EFA, LLC and contracted for the renovation of the building with Ritter Brothers. Here, Knauer and Gorman, partners in JHC, contracted with Pancoast and Clifford, Inc. for the construction of the building. The Collegium Foundation and the Charter School were not parties to the construction contract. Last, as Appellants astutely observe, "the contractual relationship (lease between Mosaica and the Ronald Brown Charter School) did not arise until they entered into a management agreement *after* Mosaica Education, Inc. had contracted for the renovations to the building." *See* Brief of Appellants at 21. Here, "the contractual relationship between 500 James Hance Court and Collegium Foundation (by a lease) was concluded on *March 1, 2007 after* JHC contracted with Knauer and Gorman Construction Co., Inc. on *September 25, 2006,* to build the building and after Knauer and Gorman Construction Co., Inc. contracted with Pancoast and Clifford, Inc. on *October 2, 2006,* to construct the building." *See* Brief of Appellants at 21.

To the contrary, the Board determined that *Mosaica II* was distinguishable:

> The shell portion, however, was later separated from the 'fit out' costs by contract amendment dated March 1, 2007, the same day that JHC entered into a building lease for the building (FF 3, 5). In this regard, the present case differs from Mosaica II. *This was not a situation where the landlord executed a construction contract before having a lease in hand, and thus embarked on construction without any legal commitment by or recourse against the ultimate tenant. Indeed the stipulated exhibits re-*

---

**8.** In *Mosaica II,* no public funds of the Ronald Brown Charter School were used for the renovation of the building. Presently, no public funds of either the Collegium Founda- tion or the Charter School were used for the cost of the construction of the "building shell."

*flect that an original lease was executed between JHC and the Collegium Charter School Foundation on October 1, 2006 .... Therefore, the property was committed to be used as a charter school when the construction agreement was amended on March 1, 2007, to split the project into two phases. (emphasis added).*

Board's Decision at 10–11.

■ However, Appellants persuasively respond that the Board's factfinding was incorrect. Specifically, the Board found

that "[o]n or about *September 25, 2006,* JHC contracted with KGC to construct a 68,000 square foot building on Lot 11 . . ." (emphasis added). *See* Board's Decision, F.F. No. 1. Appellants emphasize that this finding, which was stipulated to by the parties, established that when the construction contract was signed on September 25, 2006, *there was no lease with the Collegium Foundation.* Appellants point out that the original lease was not signed until October 1, 2006, and a comprehensive lease was not signed until March 1, 2007. Therefore, *Mosaica II* is directly on point.[9]

9. This Court also rejects the Board's determination that Appellants were either the instrumentality or alter ego of a public body. The Department stresses that JHC, the owner, contracted with Knauer and Gorman, the construction manager, for the "shell construction . . . [t]he principals of 500 James Hance Court and this general construction contractor are the same . . . [t]herefore, prevailing wages are required for their work on this project because Knauer and Gorman Construction Co. is a construction contractor for this charter school which contracted with a developer that is its mirror image." *See* Brief for Department at 24.

   In *Mosaica II*, this Court a addressed such an issue:

> *Mosaica argues that neither the facts nor the law supports the conclusion that the three entities (Mosaica, EFA, and the School) were so interwoven as to be alter egos. Mosaica argues that the School is a separate corporation paying market rate in an arms' length valid lease.*
>
> . . . .
>
> We conclude that Mosaica was not subject to the Wage Act under a piercing the corporate veil theory because it was not an instrumentality of the School. . . .
>
> . . . *[I]n the present case, there were no public funds expended and there was no public project.* Additionally, unlike in Lycoming County [*Nursing Home Association v. Department of Labor and Industry, Prevailing Wage Appeal Board*, 156 Pa. Cmwlth. 280, 627 A.2d 238 (1993)], *Mosaica is not a shell corporation set up by a public body, but is a separate entity* . . . that, since the beginning of this process, has been dealing with the School as such.

> *Nothing from the evidence presented at the hearing on remand establishes Mosaica and EFA are alter egos or instrumentalities of the School.* While it seems that Mosaica and EFA have, what could fairly be described as a symbiotic relationship, there is no evidence establishing that either has such a relationship with the School.
>
> Additionally, as to their dealings with each other . . . nothing in the evidence presented establishes that Mosaica and EFA acted on the School's behalf in a manner legally binding on the School. (citations omitted and emphasis added).

*Mosaica II*, 925 A.2d at 178–79 and 184–87.

   Here, the record fails to establish that Appellants were an instrumentality of either the Charter School or the Collegium Foundation. Appellants are private business entities involved in a business to earn a profit. The Collegium Foundation and the Charter School are non-profit corporations. Appellants are neither officers of the Collegium Foundation nor trustees of the Charter School. In turn, the Collegium Foundation and the Charter do not have a relationship with Appellants or Pancoast & Clifford, Inc. (P&C), a third party general contractor. Appellants have correctly noted: "There is no relationship between James Hance, LP and Pancoast & Clifford, Inc., between the Appellants and the [Collegium] Foundation, or between James Hance, LP and the Charter School, nor is there any support for, or even suggestion that, one or more of any of the business entities or persons is the 'alter ego' of either the Charter School or the Foundation, or vice versa." *See* Brief of Appellants at 14.

## IV. Does The Lease Reflect A Clear Bifurcation Of Private And Public Responsibilities And Funding For The Erection Of The "Building Shell" Versus Completion Of The "Fit Out" Of The Building?

■ The record fails to establish that the rent payments were the equivalent of funding for the construction of the "build-

ing shell." [10] A review of the lease between Appellants and the Collegium Foundation supports Appellants' position that it intended to maintain control over its property for a leased term of years and not to sell the property to the Collegium Foundation.[11] The rent paid by the Collegium Foundation was in consideration for the use and occupancy of the land or building. *See* Black's Law Dictionary 970 (9th ed.

---

**10.** Pursuant to the construction contract, Collegium Foundation was responsible for the construction of the "fit out" which included all electrical, mechanical, plumbing and heating systems, the interior walls, doors, fixtures, and equipment for a total cost of $1,180,000.00. *See* Construction Contract Between Knauer and Gorman Construction Company, Inc. and Pancoast & Clifford, Inc., March 1, 2007, at 1; R.R. at 302a. Appellants were responsible for the construction of the "building shell", which included among other things, site work, chain link fence, permanent seeding, cast-in-place concrete, unit masonry, structural steel, carpentry, roofing, windows, hydraulic elevator, fire sprinklers, plumbing, electric, and HVAC for a total cost of $5,527,800.00. *See* Construction Contract at 1; R.R. at 302a.

**11.** For instance, the Lease Agreement established that Appellants' retained the title and other reversionary interest in the property:
2.(a). *Renewal Option:* No Renewal Option.
. . . .
15. *Alterations.* Except for the Tenant's Work, approval for which is hereby given by the Landlord, Tenant shall make no alterations or additions to the Leased Premises or the Building or the Tax Parcel without the prior written consent of the Landlord. Tenant further agrees that: any alterations or additions to the Leased Premises except movable trade fixtures, shall at Landlord's option become part of the realty and belong to the Landlord. . . .
. . . .
18. *Assignment And Subletting.*
(a) Tenant shall not assign, mortgage, or hypothecate this Lease, or sublet or otherwise permit the use of the Leased Premises or any part thereof by any person or persons other than Tenant without the express written consent of the Landlord. . . .

19. *Condition Of The Leased Premises.* Tenant shall have sixty (60) days following the commencement date to notify Landlord of any defects or omissions in the work performed by Landlord pursuant to Paragraph 2(a) hereof and Landlord shall repair or replace such defects or perform such omitted work promptly upon the receipt of such notice subject to delays caused by factors beyond Landlord's reasonable control.
. . . .
25. *Tenant's Covenants.*
. . . .
(d) To permit Landlord to make routine periodic inspections of the Leased Premises during reasonable business hours and in emergencies at any time. . . .
(e) At the expiration or earlier termination of the Leased Term . . . promptly to yield up, clean and neat, the Leased Premises. . . .
(f) To not affix any sign, declaration, notice or other attachment of any kind or description on or to any part of the Leased Premises, the Building, or the Tax Parcel except as approved by Landlord.
. . . .
27. *Tenant's Default/Landlord's Remedies.*
(a) Fails to pay in full, when due. . . .
(b) Violates or fails to perform or otherwise breaks any covenant or agreement of this Lease. . . .
28. *Further Remedies Of Landlord.*
. . . .
(c) *Confession Of Judgment.* . . .
. . . .
35. *Surrender Of Leased Premises/Holding Over:* . . . .
Lease Agreement Between Collegium Foundation, Tenant and 500 James Hance Court, LP, Landlord, Paragraphs 2, 15, 18–19, 25, 27–28, and 35 at 2, 7–11, 13, 15, and 17; R.R. at 145a, 150a–154a, 156a, 158a, and 160a.

2009). Appellants at all times retained a reversionary interest in the property under the lease as the landlord. The Board provided no guidance to this Court, neither by statute nor by case law, to justify its conclusion that the rent was somehow synonymous with or tantamount to payments for the construction of the "building shell" leased by the Collegium Foundation.

Accordingly, this Court reverses.

## ORDER

AND NOW, this 31st day of August, 2009, the order of the Prevailing Wage Appeals Board in the above-captioned matter is reversed.

## DISSENTING OPINION BY Senior Judge KELLEY.

I respectfully dissent.

In support of its position, the majority relies upon *Mosaica Education, Inc. v. Pennsylvania Prevailing Wage Appeals Board (Mosaica II)*, 925 A.2d 176 (Pa. Cmwlth.2007), *petition for allowance of appeal denied*, 598 Pa. 744, 953 A.2d 543 (2008). However, I find *Mosaica II* readily distinguishable from the instant matter.

In *Mosaica II*, we examined the issue of whether renovations of the building ultimately used by the Ronald H. Brown Charter School were subject to prevailing wages. The building renovation contract was entered into by the management company with a third-party contractor, approximately three weeks before the charter school executed a management agreement and building lease. *Mosaica II*, 925 A.2d at 184. The charter school had no say concerning the space and performance

goals. *Id.* at 187. We rejected the argument that the company providing management services to the charter school was a "contractor" for purposes of the Pennsylvania Prevailing Wage (Wage Act).[1] *Id.* at 183–184. At the time the renovations were conducted, the management company did not have a formal contract with the school and used no public funds for the renovations. *Id.* at 184. Thus, we determined that the renovation of the school was not a public work under the Wage Act. *Id.* at 187.

Unlike *Mosaica II*, the entity of 500 James Hance Court, LLC, intended to construct a facility solely for the Collegium Charter School and had a formal relationship with the school. Originally, construction of the building shell and fit out for the Collegium Charter School were established under one contract, which was entered into on September 25, 2006. Reproduced Record (R.R.) at 67a. The lease for the charter school was entered on October 1, 2006. The various leases and construction contracts all listed the project as the "Collegium Charter School" before the work was divided in March 2007. This building would not have been built but for the Collegium Charter School occupancy.

The construction contract was amended to divide the work on March 1, 2007. This occurred after a determination by the Bureau of Labor Law Compliance (Bureau) that prevailing wages for the construction of the entire project would be issued.[2]

The Prevailing Wage Appeals Board (Board) found that the contract was divided to evade prevailing wage requirements. As the Board opined, "[t]his is not a situation where the landlord executed a con-

1. Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. § 165-1–165-17.

2. By letter dated October 27, 2007, the Bureau determined that the Wage Act applied to the construction of the building shell and fit out for the Collegium Charter School. A notice of grievance was filed by Petitioners on December 7, 2006.

struction contract before having a lease in hand, and thus embarked on construction without any legal commitment by or recourse against the ultimate tenant." Board Op. at 10. The property was committed to be used as a charter school before the construction agreement was amended and the project divided into two phases.

The exceptions to prevailing wage coverage are to be narrowly construed because of the remedial nature of the Wage Act. *DiLucente Corp. v. Pennsylvania Prevailing Wage Appeals Board,* 692 A.2d 295, 299 n. 5 (Pa.Cmwlth.1997). Given the distinctions between this case and *Mosaica II,* I cannot agree that an exception to the Wage Act should apply here. For these reasons, I believe the Board was correct in its determination that the Wage Act applied to the construction of the building shell. Accordingly, I would affirm the order of the Board.